IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs April 26, 2012

**DAVID WHITE**

v.

**EMPIRE EXPRESS, INC. AND EMPIRE TRANSPORTATION, INC.**

**An Appeal from the Chancery Court for Shelby County**
**No. CH-08-0107-2      Arnold Goldin, Chancellor**

_____

**No. W2012-00624-COA-R3-CV - Filed September 27, 2012**

_____

The case involves a lease-purchase agreement.  The plaintiff is a truck driver. The  co-defendants are two affiliated companies – a truckload hauling company and a leasing company.  The plaintiff truck driver worked for the hauling company.  The truck driver entered into a lease-purchase agreement with the leasing company to purchase the truck he drove in his work for the hauling company.  His lease payments on the truck were made via weekly payroll deductions; the hauling company deducted the amount of the lease payments from the truck driver's payroll and transferred those amounts to the leasing company on his behalf.  If the driver earned less than the amount of the lease payment, the hauling company paid the lease payment anyway and the deficiency became a debt that the truck driver owed to the hauling company.  At the end of the lease, the lease-purchase agreement required the truck driver to pay the residual value of the truck. He was allowed to pay this over the course of one year, also through weekly payroll deductions.  After the final residual payment was made, the leasing company refused to give title of the truck to the plaintiff truck driver because he still owed money to the affiliated hauling company.  The defendant leasing company then repossessed the truck and sold it.  The plaintiff truck driver filed this lawsuit against both defendant companies, alleging breach of contract, conversion, and violation of the Tennessee Consumer Protection Act.  The trial court granted summary judgment to the truck driver on his breach-of-contract claim, and it conducted a bench trial on the breach-of-contract damages and the remaining claims.  At the conclusion of the trial, the trial court held in favor of the plaintiff on all of his claims and awarded both compensatory and punitive damages. The defendants now appeal.  We affirm the award of compensatory damages and reverse the award of punitive damages.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court is Affirmed in Part, Reversed in Part, and Remanded**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and J. STEVEN STAFFORD, J., joined.

Richard Glassman and Lewis W. Lyons, Memphis, Tennessee, for the Defendant/Appellants Empire Express, Inc., and Empire Transportation, Inc.

Saul Belz and Andre B. Mathis, Memphis, Tennessee, for the Plaintiff/Appellee David White

## OPINION

### FACTS AND PROCEEDINGS BELOW

### Background

This is the second appeal in this case.[1] ***See White v. Empire Express, Inc.,*** No. W2010-02380-COA-R3-CV, 2011 WL 6182091 (Tenn. Ct. App. Dec. 13, 2011). Defendant/Appellants Empire Express, Inc. ("Hauling Co."), and Empire Transportation, Inc. ("Leasing Co."), are two Tennessee brother-sister corporations. In 1986, Ed Gatlin ("Gatlin") and his son, Tim Gatlin ("Tim"), formed the Hauling Co. as an irregular route truckload carrier; it hauls freight throughout the forty-eight continental United States. The Leasing Co. was formed a few years later, in 1989 or 1990, with the same owners, Gatlin and his son Tim. The Leasing Co. owns the trucks and trailers used by the Hauling Co.

The two affiliated corporations operate their finances in a way that is overlapping and interrelated. The Leasing Co. does not maintain a balance in its bank account. Rather, its bank account operates as a "sweep account," whereby its balance is swept to zero on a daily basis, and all funds in the Leasing Co.'s account at the end of each day are deposited into the Hauling Co.'s bank account. If the Leasing Co. writes a check, it is automatically covered as a draw from the Hauling Co. bank account. When the Leasing Co. acquires a truck for its lease-purchase program, the truck purchase is financed. The collateral that the Leasing Co. puts up for the financing of its trucks includes cross-collateralization and a guaranty by the Hauling Co.

Plaintiff/Appellee David White ("White") began working for the Hauling Co. in 2000 as a "company employee," driving a company-owned truck. The next year, in 2001, the Leasing

---

[1]Many of the facts recited in this Opinion are taken from our Opinion in the first appeal.

Co. began offering a lease-purchase program to any driver who wanted to own his own truck and become an independent contractor instead of an employee. In general, independent contractors earn more money per mile driven, but they are also responsible for costs associated with truck ownership that company employees are not required to pay.[2] Not long after the lease-purchase program became available, White decided to participate and become an independent contractor.

The documentation to participate in the lease-purchase program involved several agreements, some with the Leasing Co. and others with the Hauling Co. The overlapping and interrelated operations of the two companies were reflected in the documentation for the program. To begin, on January 18, 2002, White executed a Lease-Purchase Agreement ("Lease") with the Leasing Co. to purchase a 2000 Classic Freightliner XL truck. Under the Lease, White had several financial obligations: (1) make rental payments of $1,909.05 per month for 48 months, payable in weekly installments of $440.55; (2) pay for fuel, excess mileage charges, insurance, certain taxes, and communication system costs; and (3) pay for all repairs and maintenance to the truck. To ensure White's compliance with these financial obligations, the Lease provided that a portion of White's earnings would be placed into escrow.[3] Paragraph 22 of the Lease also stated that, "as additional security" for the Lease, White would "pledge a contract with a regulated motor carrier . . . to secure lease payments to [the Leasing Co.]. In addition [White] agrees to authorize the Carrier to deduct and pay [the Leasing Co.] any amounts due [the Leasing Co.] from any contract." The "regulated motor carrier" to which this paragraph referred was the Hauling Co.

Many of the payments required of White were itemized in a schedule attached to the Lease, "Schedule A." The Lease provided that, if White incurred any liability to the Leasing Co., the amount of the liability would become payable by White as additional rent for the truck. Thus, these amounts would be deducted from White's earnings in the same manner as the truck lease-purchase payments.

Paragraph 24 of the Lease gave White the right to purchase the truck at the end of the Lease by making a balloon payment of $22,908.60, stated in Schedule A as the residual value of the truck. Paragraph 24 of the Lease reads:

---

[2]Typically, a company employee earns about 35 or 36 cents per mile, while an independent contractor earns about 85 cents per mile. The independent contractor, however, is responsible for the costs of owning his vehicle, such as fuel, maintenance, repairs, and insurance.

[3]The Lease provided for two escrow accounts, a "maintenance escrow" or Maintenance Reserve Account, and a "security escrow" or Security Escrow Fund.

[White] shall have the right to elect to purchase the [truck] identified in Schedule A at the amount therein specified which said amount is the reasonable value of [the truck] at the end of this lease. If [White] fails to have all payments required under this Lease paid in full at the end of this Lease, [White] shall forfeit [his] option to purchase [the truck].

Thus, under this paragraph of the Lease, White was entitled to purchase the truck for its residual value, but he forfeited that right if he failed "to have all payments required under this Lease paid in full at the end of this Lease."

On January 21, 2002, White executed two more agreements related to the Lease. The first was a Contract Hauling Agreement ("Work Agreement") with the Hauling Co., that designated White as an independent contractor of the Hauling Co. and set out the terms of his work and compensation. Under the Work Agreement, White was responsible for "[s]electing, purchasing, financing, and maintaining" the truck, and for paying "all operating expenses and repairs" associated with the truck.[4] A schedule was also attached to the Work Agreement, "Schedule II," which itemized authorized deductions to be made from White's earnings to repay any cash advances the Hauling Co. made, either to White or to third parties on his behalf for truck repairs, maintenance, and the like.[5] The list of authorized deductions in Schedule II included a broad catchall: "Any advance or loans of any kind" made by the Hauling Co. to White.

The third agreement White executed was a "Direct Pay Authorization," a one-paragraph document authorizing the Hauling Co. to deduct from White's earnings any amounts due under the Lease and pay those amounts directly to the Leasing Co. on White's behalf.[6] Thus, under the Work Agreement and the Direct Pay Authorization, White authorized the Hauling Co. to deduct from his earnings any amounts he owed to either the Leasing Co. under the Lease or to the Hauling Co. under the Work Agreement.

---

[4]Both the Lease and the Work Agreement provided that White was to pay for repairs and maintenance to the truck.

[5]For example, it was typical for White to purchase fuel or similar items on the Hauling Co.'s account with a third party. The Hauling Co. would pay the bill to the third party and then deduct the expense from White's earnings.

[6]The record is unclear as to whether these deductions for amounts due under the Lease were ever actually transferred to the Leasing Co., given that the Leasing Co. maintained only a "sweep account." It appears that the Lease payments may have been simply retained by the Hauling Co., and that this was deemed to satisfy White's obligation to the Leasing Co. under the Lease.

From January 2002 until September 2007, White continued to work for the Hauling Co. as an independent contractor. During this time, the Hauling Co. made weekly deductions from White's earnings for amounts White owed to both the Leasing Co. and to the Hauling Co. During any given week, if White earned enough money to cover the total amount of deductions, he was paid the net amount over and above the deductions. If he did not earn enough money to cover the deductions, the Hauling Co. would deduct the full amount owed for that week and advance White the deficiency in order to cover his full payment. The amount advanced by the Hauling Co. then became White's debt to the Hauling Co. This debt would accrue from week to week, with no set plan for repayment. Gatlin later explained how White paid the weekly rent for the truck and the other truck-related expenses:

> [Gatlin:] . . . [T]he way that works that is if he doesn't have the money to make the payment, I didn't foreclose on it. We either made it for him or apparently we let it slide, and we would give him an extra week to make the payment or something like that, and that's where this debt accumulated.
> [Q:] How would he make the payment?
> [Gatlin:] It's withheld from his payroll.
> [Q:] So, if it's withheld from his payroll, how could he be late making a payment?
> [Gatlin:] He didn't make enough money to make his payment.
> [Q:] What happens when he doesn't make enough to make his payment?
> [Gatlin:] He goes in debt for the amount of that payment.
> [Q:] Do y'all not take it out of his next paycheck?
> [Gatlin:] We would if he can afford it, but if he doesn't make enough money to catch up, he wouldn't, and [we] let [White] slide along and that's how he accumulated this debt.

In this way, all of White's truck rental payments to the Leasing Co. were made in a timely manner, *albeit* with funds essentially borrowed from the Hauling Co. Although the Lease provided that the Leasing Co. could charge White 1.5% delinquency fee for all delinquent payments under the Lease, the Leasing Co. never enforced this provision against White. Every week, the Hauling Co. gave White a settlement sheet that detailed his earnings, his expenses, and the amount of debt accrued from the advances made to him by the Hauling Co.

In 2005, White filed a petition for bankruptcy. During the bankruptcy proceedings, he continued to drive for the Hauling Co. Under the terms of White's bankruptcy plan, the Hauling Co. was required to deduct certain amounts from White's earnings. Although the

Lease listed bankruptcy as a basis for default, no one with either of the defendant companies indicated to White that his bankruptcy filing might prevent him from purchasing the truck.

At some point prior to May 2006, White made his final rental payment under the Lease. The weekly settlement sheet that corresponds with that time period indicated to White that, as of the date he made the last rental payment, he owed the Hauling Co. $2,271.77 in cash advances and loans. Under the terms of the Lease, White forfeited his option to purchase the truck if he failed "to have all payments required under [the] Lease paid in full at the end of [the] Lease." Despite White's debt to the Hauling Co., in May 2006, White told Gatlin that he wanted to exercise his option under the Lease to purchase the truck by paying its residual value. The Lease did not specify the manner in which White had to pay the residual value of the truck at the end of the lease period in order to exercise his option. In this instance, Gatlin permitted White to pay the residual value over one year by allowing White to continue driving for the Hauling Co. and to make weekly payments on the residual value in the same manner that the truck rental payments and other truck expenses had been made — through weekly payroll deductions. This extended payment arrangement was not reduced to writing and is not part of the Lease, but the arrangement is undisputed. In any event, White continued to drive the truck for the Hauling Co. under the Work Agreement while the weekly payments toward the residual value were deducted over the next year. During this time, the parties never discussed whether or how White's accrued debt would affect his ability to purchase the truck.

Every week from May 18, 2006, until May 3, 2007, $468.23 was deducted from White's payroll to pay off the $22,908.60 residual value of the truck. During this same time, White's weekly compensation was often not enough to cover the payment on the residual value for that week plus other expenses. Therefore, while the weekly payments toward the residual value were being made in this way, White's debt to the Hauling Co. continued to increase substantially.

As of May 10, 2007, the balance remaining on the residual value of the truck, $1,370.02, was deducted from White's paycheck. By that time, as reflected in the settlement sheets, White's debt to the Hauling Co. had escalated to over $20,000.

Shortly after the final residual payment was deducted from White's pay, he approached Gatlin to ask for the title to the truck. Gatlin refused to do so, and explained to White that he would not give him the title to the truck because White still owed money to "the company" in an amount that exceeded the value of the truck. Gatlin told White that he had to pay off this accumulated debt in order to receive title to the truck. In this conversation, Gatlin tried to convince White to become a company driver. Gatlin suggested that White

give up on owning the truck so that White could earn more money without the burden of the expenses associated with ownership. White took Gatlin's suggestion under consideration.

A few days later, White called Gatlin. In this call, White told Gatlin that he wanted title to the truck so that he could drive routes for another carrier. Gatlin again refused, and again told White that his refusal was because White still owed a debt to "the company." After that conversation, Gatlin told one of his employees, Nelson Firmin ("Firmin"), to go to White's home and repossess the truck from White. Pursuant to Gatlin's directive, Firmin repossessed the truck from the driveway of White's home and brought it back to the Leasing Co., without giving advance notice to White. Soon thereafter, the Leasing Co. sold the truck to a third party for $18,000, without giving White prior notice of the sale.

**Lawsuit**

On January 16, 2008, White filed the instant lawsuit in the Chancery Court of Shelby County, Tennessee against the Hauling Co. and the Leasing Co. (collectively, "Defendants"). White sought a declaratory judgment and asserted claims based on breach of contract, conversion, and violation of the Tennessee Consumer Protection Act ("TCPA").[7] White alleged that he had made all of the truck rental payments and had paid the residual value of the truck under the Lease, so the Defendants' refusal to transfer title of the truck to him was a breach of the Lease. In addition, White contended, the Defendants' repossession of his truck constituted conversion, and their conduct amounted to unfair or deceptive acts under the TCPA. White sought compensatory and punitive damages for the breach of contract and conversion claims, and he sought treble damages and attorney fees under the TCPA.

The Defendants filed an amended answer in which they admitted that White had made all of the rental payments toward the purchase of the truck, but they claimed that White defaulted under the Lease by failing to pay his accrued debt to the Hauling Co. The Defendants added a counterclaim, seeking a declaration that White failed to satisfy his obligations under the Lease. The Defendants also sought a money judgment for damages suffered from White's breach of the Lease, including attorney fees incurred in defending the lawsuit.
Discovery ensued. The parties took the depositions of Gatlin, White, and Irish Chatman, the office manager for both the Hauling Co. and the Leasing Co. At various stages in the proceedings, all of the depositions were filed in the record.

---

[7]The original complaint also included another truck driver, Willie Cockal, as a co-plaintiff. Ultimately, Cockal's claims were dismissed, and they are not at issue in this appeal.

## Summary Judgment

On April 28, 2009, the Defendants filed a motion for summary judgment. They claimed that, based on the undisputed facts, White was in default under multiple contract provisions, and so he had forfeited his option to purchase the truck and had lost his right to possess it.[8] In the alternative, the Defendants argued in a supplemental memorandum that the Hauling Co. was a third-party beneficiary of the Lease and thus was entitled to the rights afforded to the Leasing Co. under the Lease. They made the parallel argument that, for the same reason, the Leasing Co. was entitled to all of the rights afforded to the Hauling Co. under the Work Agreement. The Defendants claimed that they were entitled to summary judgment on their counterclaim for attorney fees and other damages pursuant to the Lease, and also on their claim for attorney fees under the TCPA, because White's TCPA claim was "frivolous and totally lacking factual and legal support." Tenn. Code Ann. § 47–18–109(e)(2). In support of their motion, the Defendants relied on their contemporaneously filed memorandum of law, statement of undisputed facts, and the entire record.

On the same day, White filed a cross-motion for partial summary judgment. In White's cross-motion, he argued that the undisputed facts established that he had satisfied his obligations under the Lease by making all of the weekly rental payments, and that he had exercised his option to purchase the truck by paying off the residual value. White asked the trial court to grant him partial summary judgment by declaring that the Defendants breached the Lease, and by holding the Defendants liable for conversion of the truck. White argued that, even if he had been in default under the Lease when he exercised his option to purchase the truck, the Leasing Co. waived its right to enforce the forfeiture provision by allowing White to pay the residual value of the truck, while at the same time failing to inform him that his accrued debt would disqualify him from owning the truck.

The trial court conducted a hearing on the parties' cross-motions for summary judgment.[9] After the hearing, the trial court entered an order granting in part White's motion for partial summary judgment and denying in total the Defendants' motion for summary judgment. In addressing White's motion, the trial court held that White had met all of his obligations to the Leasing Co. under the Lease, even though he owed money to the Hauling Co. The trial court found it critical that the Defendants were two separate entities, and that White owed different obligations to each:

---

[8]The summary judgment motion simply refers to defaults under the "contract," which presumably is a reference to the Lease, although this is not stated expressly.

[9]The appellate record does not include a transcript of that hearing.

[The Hauling Co.] and [the Leasing Co.] are two separate corporations. Throughout their pleadings, Defendants use the common portion of their name, Empire, to somehow indicate that duties owed by White to either corporation under either contract were indistinguishable. Yet when, as is the case here, "parties have deliberately undertaken to do business in corporate form . . . they must be held to the corporate form and they cannot shunt aside at their convenience legal entities and the legal aspects thereof." **Shelby County v. Barden**, 527 S.W.2d 124, 130 (Tenn. 1975). Defendants argue that White breached the Equipment Lease because he owed money to [the Hauling Co.] at the time he tried to exercise the purchase option, but there is no mention of any obligation to [the Hauling Co.] in the terms of the Equipment Lease with [the Leasing Co.]. Under the Equipment Lease, White agreed to undertake certain duties only to Lessor, which is [the Leasing Co.]. Counsel for Defendants argues that the [Work Agreement] with [the Hauling Co.] was intended as collateral for the Equipment Lease with [the Leasing Co.]. Yet there is no such intent evident or expressed within the four corners of the contract, and "when the language of the contract is plain and unambiguous, the court must determine the parties' intention from the four corners of the contract, interpreting and enforcing it as written." **Simonton v. Huff**, 60 S.W.3d 820, 825 (Tenn. Ct. App. 2000) (citations omitted).

Thus, based on its finding that the Lease did not "mention . . . any obligation to [the Hauling Co.]," the trial court held that White had met all of the requirements necessary to purchase the truck under the Lease. The trial court declined to grant White's motion for summary judgment as to his conversion and TCPA claims, finding genuine issues of material fact as to those claims. The trial court denied the Defendants' motion for summary judgment on the claim for attorney fees under the TCPA, and it dismissed the Defendants' counterclaim for attorney fees under the terms of the Lease. Both parties filed motions for reconsideration and/or clarification of the trial court's order. Those motions were denied, although the trial court did clarify that White's motion for partial summary judgment was granted "as to his claim for breach of contract for the Equipment Lease" with the Leasing Co.

### Motion to Amend

After the trial court entered its order on the cross-motions for summary judgment, the Defendants filed a motion to amend their answer to add the affirmative defenses of setoff and recoupment. In the motion, the Defendants alleged that the undisputed evidence showed that White owed the Hauling Co. over $20,000 for the amounts advanced to him pursuant to the Work Agreement. They argued that any amounts White recovered in his lawsuit should be

reduced by the amount that he owed the Hauling Co. Over White's objection, the trial court entered an order permitting the amendment.

On the eve of the scheduled trial, February 1, 2010, White filed a motion to dismiss and to compel arbitration of the Defendants' affirmative defenses of set-off and recoupment based on an arbitration provision in the Work Agreement. The motion was taken under advisement.

**Trial**

On February 2, 2010, the trial court conducted a bench trial on all of the unresolved issues: damages for the Leasing Co.'s breach of the Lease, White's TCPA and conversion claims against the Defendants, and the defenses of set-off and recoupment. The trial court heard testimony from both Gatlin and White during White's case-in-chief.

At the outset, Gatlin described his discussions with White on all of the lease-purchase arrangements. Gatlin testified that he met with White before White signed the Lease. According to Gatlin, he told White that his truck would be financed over a 48-month period, with a balloon payment at the end, and that after the 48-month period, White's choices would be to (1) sell the truck, pay the Defendants any money owed, and keep the difference; (2) sell the truck, pay the Defendants any money owed, and use the difference to lease-purchase another truck; or (3) "continue driving [the truck] and spread his fifth year payments out over the following year and pay it down to zero." When Gatlin was asked whether he told White that he would have to pay all of his debts to the Hauling Co. before he could obtain title to the truck, Gatlin replied, "It's in the contract that I told Mr. White that he had to pay all the debts to the company. . . . I just told him that he had to pay his debts to the company. I didn't specify which one." Gatlin said that he gave White the contract and told him to read it, initial each page, and return it to Gatlin with any questions. Gatlin could not recall whether White ever returned to him with additional questions, but Gatlin believed that White understood both the Lease and the Work Agreement.

Gatlin recalled meeting with White the Monday before the truck was repossessed. Nelson Firmin was present at this meeting. Gatlin said that White asked him for title to the truck, but Gatlin refused because White owed money to "the company." Gatlin explained that, at the time, he did not differentiate between the companies. He said that he was "treating these affiliate companies as one at that time. I was not recognizing the fact that [White] owed one and drove for the other, . . . but I did tell him that he had to pay his debt . . . before I could give him the title." Gatlin testified that he then had a long talk with White about White becoming a company driver again and explained that he thought White "would make more money and would be better off driving for the company." He assured White that the company would "put him in a brand new truck and convert him and sell his truck and it

would take care of all or most of his debt. If there was anything left over, he would get it; if it was short, I'd write it off or give him an opportunity to pay it . . . ." Gatlin testified that White "seemed to be very encouraged and very happy about that . . . . Mr. White seemed very pleased with that . . . ." At the end of the conversation, Gatlin said, he instructed White to bring the truck back to the company.

The following Thursday, Gatlin stated, White called him on the telephone and again requested title to the truck, explaining that he needed the truck title in order to work for another carrier in Louisiana. Gatlin again told White that he could not have title to the truck until he paid his debt to the company. When White told Gatlin that he wanted to work for another company, Gatlin said, it became obvious that White was not going to bring the truck back to the company as they had discussed. So when Gatlin hung up the telephone, he directed Firmin to go to White's home and repossess the truck. Gatlin explained, "I had title to the truck. . . . I felt it was our truck until all his debts were satisfied." Gatlin later had the truck sold. It sold for $18,000, the highest offer. White was not notified in advance of the sale of the truck.

Gatlin testified that, since the lease-purchase program was implemented, the Leasing Co. had entered into over 100 lease-purchase agreements with its drivers. Of those, he said, they had repossessed trucks from only three of the participating drivers, including White.[10] In every other case, Gatlin stated, when the participating driver had paid off the residual value of the truck but still owed money to the Hauling Co., the Leasing Co. retained the title to the truck until the debt was paid to the Hauling Co. He maintained that White was treated no differently from the other drivers.

Gatlin testified that the Leasing Co. originally paid $80,000 for the truck that White contracted to purchase under the Lease. Under the lease-purchase arrangement, Gatlin acknowledged, White's lease-purchase payments, made through payroll deductions, totaled about $116,000. This total was comprised of $91,000 in rental payments, $3,000 in security escrow contributions, and $22,908.60 for the residual amount of the truck over the last year.[11] When the truck was repossessed and sold, the Leasing Co. received $18,000 in sale proceeds. Therefore, all told, the Defendants received about $134,000 for the truck over the years from their Lease with White.

_____

[10]The other two were Willie Cockal, White's former co-plaintiff, and a third driver who voluntarily relinquished his truck because of drug issues.

[11]In his testimony, Gatlin mistakenly agreed that the residual value was $23,908.60, rather than the correct value of $22,908.60.

-11-

Firmin also testified at trial. Firmin said that he worked for both the Leasing Co. and the Hauling Co., and that he was responsible for all of the trucks and the maintenance of the trucks. After Gatlin refused to give White title to the truck, Firmin said, he personally spoke to White, and White "was really glad, acted like he was relieved to be able to get in a position where he didn't have all this overhead . . . ."

White testified on his own behalf. In his testimony, White claimed that, when he first met with Gatlin about participating in the lease-purchase program, Gatlin did not advise him that he would not be given title to the truck if he owed money to the Hauling Co. He was told, White said, that after the 48 monthly payments were made, and after the balloon payment of the residual value was made, he would get title to the truck.

White also testified about his discussions with Gatlin after White made the final payment of the residual value of the truck. When he asked Gatlin for title to the truck, White stated, that was the first time "[Gatlin] told me I owed him some money." White said he was told only that the money was owed to "the company," without specifying the company to which it was owed. After that, White asserted, he was "shut down" until he had further discussions with Gatlin. When he finally met with Gatlin, Gatlin asked him to drive a company truck. White wanted to own his own truck and did not want to be a company driver, but he felt that he was given no choice. Around that time, White said he noticed that his "mileage was steadily dropping," that is, he was not being asked to drive as many miles. Because Empire was not assigning him as many trips, White stated, he applied to work with another carrier. After he did this, White again called Gatlin to ask for title to the truck so that he could send the truck title to the other carrier; in this way, White planned to pay his debt to the Hauling Co. through the compensation he received from the other carrier. According to White, Gatlin told him, "I can get you all the miles you want in a company truck." White responded that he wanted the miles in his own truck. Gatlin reportedly replied, "I can't do that." It was after this that White's truck was repossessed from the driveway of his home.

On cross-examination, White was asked about the number of miles he drove for the Hauling Co. White agreed that, in a good month where he was given plenty of work, he generally drove about 17,200 miles per month, or 34,000 for a two-month period. During his last two months with the Hauling Co., as reflected in the settlement sheets, White drove about 24,384 miles. White agreed that this mileage was around the average number of miles that he drove for the entire time he worked for the Hauling Co., and said, "That's pretty good miles . . . ." White acknowledged that truck drivers in the United States drive an average of about 2,500 miles per week, and that the average number of miles he drove in his final two months with the Hauling Co. was more than that. Nevertheless, White maintained that "the miles started dropping when I asked about [title to] the truck."

White also conceded that, even though Gatlin did not tell him, he knew that "all maintenance, advances, and loans under the [Work Agreement] had to be paid before [he] could get title to the truck." White said that he understood this, and understood that this was part of the agreement between the parties. He was then asked: "And you, in fact, did not pay all moneys due to [the Hauling Co.] for maintenance, loans, and advances, did you? When you left, there was still a balance due, wasn't there?" White replied, "They said that I owed." In the early stages of the litigation, White had challenged the Defendants' claim that he owed them money and had asserted that the evidence presented to substantiate their claim was fabricated. By the time of trial, however, White acknowledged the debt he owed to the Hauling Co.

In his testimony, White was also asked whether the agreements with the Leasing Co. and the Hauling Co. were fair, and whether it was fair to require him to pay his debt to the Hauling Co. before he could receive title to the truck. He replied, "Yes, I thought it was a fair agreement . . . [i]f they would hold up their end of the bargain." White also agreed that the Hauling Co. could have declared him in default early on, when he was unable to make his Lease payments, and that it was "nice" of the Hauling Co. to instead advance him money to make his Lease payments. White stated that the Hauling Co. sometimes gave him cash advances to pay his personal bills, and that the company had never denied his request for an advance.

After White concluded his case in chief, the Defendants made a motion pursuant to Tennessee Rule of Civil Procedure 41.02(2) for an involuntary dismissal at the close of the plaintiff's proof on White's claims of conversion and violation of the TCPA. The trial court denied this motion.

The Defendants then offered the testimony of the office manager for the Hauling Co., Irish Chatman. She verified that all of the charges made to White's account were legitimate and accurate. Chatman confirmed that White drove 24,384 miles during his last two months with the Hauling Co., and that the average mileage for a Hauling Co. driver was 2,500 miles per week. Therefore, in his last two months working for the Hauling Co., White was assigned more miles than the average driver.

Chatman testified that, periodically, White requested advances from the Hauling Co. to pay personal bills or other personal expenses. He was never denied a requested advance, she said. Chatman stated that, on the date White stopped working for the Hauling Co., he owed the company about $20,800.

At the conclusion of the testimony, the trial court took the case under advisement.

## Trial Court's Decision

On April 15, 2010, the trial court issued its findings of fact and conclusions of law, holding in favor of White on all of his claims. As damages for the Leasing Co.'s breach of contract, the trial court awarded White $18,000 – the amount for which the truck was sold. The trial court also held that White was entitled to $18,000 in compensatory damages for conversion against both Defendants and $18,000 in compensatory damages for violations of the TCPA, also against both Defendants.

The trial court also held in White's favor on his claim for punitive damages based on conversion. The trial court determined that the conversion was intentional, and that the Defendants' conduct was retaliatory in nature. The court explained:

> Soon after White requested title to the tractor-trailer, a dispatcher for the Hauling Company told White that he was "shut down" until White spoke with Gatlin. When White spoke with Gatlin, Gatlin, as a co-owner and officer of each of the Defendant corporations, attempted to convince White to revert back to being a company driver rather than continuing to work as an owner-operator. This proposal involved White giving up ownership of the tractor-trailer so that an attempt could be made to settle White's alleged debts with the Hauling Company. White, however, already had satisfied all of his obligations to the Leasing Company under the Equipment Lease's purchase option. White rejected this proposal and sought work with another carrier. The very same day that White informed Gatlin that he would be leaving to work for another carrier, Gatlin directed Firmin to remove the tractor-trailer from White's driveway. Firmin, in fact, did remove the tractor-trailer from White's driveway later that same day. The Court finds that these facts clearly and convincingly establish that it was Gatlin's conscious objective and desire, as a co-owner and officer of both Defendant corporations, that the tractor-trailer be converted. Further, the Court finds that Gatlin directed Firmin to convert the tractor-trailer, in part, in retaliation for White rejecting Gatlin's proposal and for White arranging to go to work for another carrier.

The trial court did not at that point fix the amount of the punitive damage award, but said that the amount would be determined at a future hearing. The trial court also held that the Defendants' actions justified an award of treble damages under the TCPA.[12] Finally, the trial court held that the Defendants' affirmative defenses of setoff and recoupment were subject

---

[12] After the hearing on the amount of punitive damages, White was required to choose between the award of punitive damages for conversion and treble damages under TCPA.

to the arbitration provision in the Work Agreement, so it granted White's motion to dismiss and to compel arbitration of those defenses.

On September 8, 2010, the trial court conducted a hearing to determine the amount of punitive damages to be awarded to White.[13] On September 16, 2010, the trial court entered an order awarding White $100,000 in punitive damages.[14] In a separate order, after another hearing, the trial court awarded White $88,266.25 in attorney fees and $5,035.13 in expenses pursuant to the TCPA. On October 1, 2010, the trial court entered an order detailing all of its previous awards.[15]

On February 28, 2012, the trial court entered an order indicating that the issues of setoff and recoupment, which had been referred to arbitration, had "been resolved and settled and that the claims submitted to Arbitration are hereby dismissed with prejudice." On the same day, the trial court entered a final order recounting its previous rulings and adding: "the Hauling Company is entitled to setoff/recoupment in the amount of $20,875.13 against White." Now that a final order has been entered, the Defendants appeal.

## ISSUES ON APPEAL AND STANDARD OF REVIEW

On appeal, the Defendants raise numerous issues:

> 1. Whether the trial court erred in granting White's motion for summary judgment on his breach-of-contract claim?
>
> 2. Whether the trial court erred in denying the Defendants' motion for summary judgment on White's breach-of-contract claim?
> 3. Whether the trial court erred in denying the Defendants' motion for summary judgment on White's conversion claim?

---

[13] A transcript of that hearing is not included in the appellate record.

[14] In its order, the trial court noted that the Defendants had made an "ore tenus" motion to dismiss White's punitive damages claim; the trial court denied this motion in the same order in which it fixed the amount of the award of punitive damages.

[15] After the October 2010 order was entered, the Defendants filed their first appeal. This appeal was dismissed for lack of appellate jurisdiction because the trial court had compelled arbitration of the defenses of setoff and recoupment and, therefore, had not resolved all the rights and liabilities of the parties. *White v. Empire Express, Inc.*, No. W2010-02380-COA-R3-CV, 2011 WL 6182091, at *7 (Tenn. Ct. App. Dec. 13, 2011). We dismissed the appeal and remanded the case to the trial court with instructions to stay the matter pending arbitration of those defenses.

4.  Whether the trial court erred denying the Defendants' motion for summary judgment on White's TCPA claim?

5.  Whether the trial court erred in denying the Defendants' motion for summary judgment on their counterclaim for attorney fees under the Lease?

6.  Whether the trial court erred in excluding evidence and testimony related to White's bankruptcy petition?

7.  Whether the Defendants were entitled to an involuntary dismissal of White's claims at the conclusion of his proof at trial?

8.  Whether the trial court's findings of fact were supported by the weight of the evidence?

9.  Whether the trial court's conclusions of law were accurate?

10.  Whether the trial court erred in awarding punitive damages?

11.  Whether the trial court erred in awarding White treble damages under the TCPA?

12.  Whether the award of $100,000 in punitive damages was excessive and whether it was supported by the evidence?

The first five issues raised by the Defendants relate to the trial court's decision to grant summary judgment in favor of White and to deny summary judgment in favor of the Defendants. Our review of the trial court's decision to either grant or deny a motion for summary judgment is a question of law, subject to *de novo* review, with no presumption of correctness in the trial court's decision. ***Kinsler v. Berkline, LLC***, 320 S.W.3d 796, 799 (Tenn. 2010).

To be entitled to summary judgment, the moving party must negate an essential element of the nonmovant's claim or defense and show by undisputed evidence that the nonmovant is unable to prove an essential element of the claim or defense at trial. ***Martin v. Norfolk S. Ry. Co.***, 271 S.W.3d 76, 83-84 (Tenn. 2008) (citing ***Hannan v. Alltel Pub. Co.***, 270 S.W.3d 1, 5 (Tenn. 2008); ***McCarley v. W. Quality Food Serv.***, 960 S.W.2d 585, 588 (Tenn. 1998); ***Byrd v. Hall***, 847 S.W.2d 208, 215 (Tenn. 1993)). Therefore, the movant is required to shift the burden of production to the nonmovant, either by affirmatively negating an essential element of the nonmovant's claim or by showing that the nonmovant cannot prove an essential element of his claim at trial. ***Martin***, 271 S.W.3d at 83; ***Hannan***, 270 S.W.3d at 8-9; ***McCarley***, 960 S.W.2d at 588.

If the moving party makes a properly supported motion, then the nonmoving party is required to produce evidence of specific facts establishing that genuine issues of material fact exist. ***Byrd***, 847 S.W.2d at 215. The nonmoving party may satisfy its burden of production by:

(1) pointing to evidence establishing material factual disputes that were over-looked or ignored by the moving party; (2) rehabilitating the evidence attacked by the moving party; (3) producing additional evidence establishing the existence of a genuine issue for trial; or (4) submitting an affidavit explaining the necessity for further discovery pursuant to Tenn. R. Civ. P., Rule 56.06.

*Martin*, 271 S.W.3d at 84 (quoting *McCarley*, 960 S.W.2d at 588). The nonmoving party's evidence must be accepted as true, and any doubts concerning the existence of a genuine issue of material fact shall be resolved in favor of the nonmoving party. *Id.* "A disputed fact is material if it must be decided in order to resolve the substantive claim or defense at which the motion is directed." *Byrd*, 847 S.W.2d at 215. A disputed fact presents a genuine issue if "a reasonable jury could legitimately resolve that fact in favor of one side or the other." *Id.*

The admissibility of evidence is a matter within the discretion of the trial court, and we review such evidentiary decisions for an abuse of discretion. *Pullum v. Robinette*, 174 S.W.3d 124, 137 (Tenn. Ct. App. 2004). A trial court abuses its discretion if it applies an incorrect legal standard or reaches an illogical or unreasonable decision that causes an injustice to the complaining party. *State v. Stevens*, 78 S.W.3d 817, 832 (Tenn. 2002).

The other issues on appeal relate to the trial court's determinations regarding liability and the weight of the evidence presented at trial. In reviewing the trial court's decision, we presume the trial court's findings of fact to be correct unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). "When credibility and weight to be given testimony are at issue, considerable deference must be afforded the trial court when the trial judge had the opportunity to observe the witness' demeanor and to hear in-court testimony." *Mitchell v. Fayetteville Pub. Utils.*, No. M2011-00410-SC-R3-WC, 2012 WL 1593122, at *4 (Tenn. May 8, 2012). Therefore, we will not overturn a factual finding that was based on a credibility determination absent clear and convincing evidence to the contrary. *Hughes v. Metro. Gov't of Nashville & Davidson County*, 340 S.W.3d 352, 360 (Tenn. 2011). We review the trial court's conclusions of law *de novo*, with no presumption of correctness. *Whaley v. Perkins*, 197 S.W.3d 665, 670 (Tenn. 2006).

**ANALYSIS**

**Summary Judgment — Breach-of-contract Claim**

We first address the Defendants' contention that the trial court erred in granting summary judgment in favor of White on his breach-of-contract claim, and in denying the Defendants' motion for summary judgment on this claim. The Defendants argue that the trial court's interpretation of the Lease was erroneous in several respects. They claim that the trial court ignored Paragraph 22, which required White to "pledge a contract with a regulated motor carrier . . . to secure lease payments to [the Leasing Co.]" as "additional security." They further argue that White was in default under several provisions of the Lease well before Gatlin refused to transfer title of the truck to White. If White was in default, the Defendants contend, not only were they justified in refusing to turn over title to the truck, but also under Paragraph 18 of the Lease, they were authorized to enter White's property and repossess the truck. The "Events of Default" are found in Paragraph 17 of the Lease:

> 17. EVENTS OF DEFAULT: An event of default shall occur if (a) any Rental Payment or any other amount owed by [White] to [the Leasing Co.], whether hereunder or under any other instrument or agreement, is not paid promptly when due; (b) [White] breaches any warranty or provision hereof or of any other instrument or agreement delivered by [White] to [the Leasing Co.] or to any affiliate of [the Leasing Co.]; (c) [White] ceases to do business as a going concern, becomes insolvent, makes an assignment for the benefit of creditors, admits in writing [his] inability to pay [his] debts as they become due, or takes advantage of any law for the relief of debtors; (d) any property of [White] is attached; (e) a petition in bankruptcy or for an arrangement, reorganization, composition, liquidation, dissolution or similar relief is filed by or against [White] under any present or future statute, law or regulation; (f) [White] or [his] shareholders take any action looking to [his] dissolution or liquidation; or (g) a trustee or receiver is appointed for [White] or for any substantial receiver that is appointed for [White] or for any substantial part of [his] property.

The Defendants claim that there were several events of default under Paragraph 17. First, pursuant to subsection (a), they argue, White defaulted on the Lease by not promptly repaying his debts to the Leasing Co. and by failing to make payments when due to the Hauling Co. They argue: "It is undisputed that costs were advanced by [the Hauling Co.] and under the Lease these advances were to be treated as additional rents under the Lease." White defaulted under subsection (b), the Defendants contend, by breaching the Work Agreement, which they characterize as an agreement between White and the Leasing Co.'s

-18-

"affiliate," the Hauling Co. The Defendants also maintain that White's bankruptcy and/or insolvency was a material, ongoing default under subsections (c) and (e) of Paragraph 17 of the Lease. They argue: "White was bound by the terms of both contracts, violated terms of both the Lease and [Work Agreement] and was not excused from performance under either agreement." At the very least, the Defendants insist, there are genuine issues of material fact as to which party committed the first material breach of the Lease so as to preclude the grant of summary judgment on this issue.

In response, White argues that the trial court correctly determined that he had fulfilled all of his obligations under the Lease and had effectively made payments and purchased the truck under Paragraph 24. He contends that the Leasing Co. and the Hauling Co. are not entitled to enforce each other's contracts, and that he owed no obligation to the Hauling Co. under the Lease. White asserts that the Defendants waived their right to assert the first-to-breach argument procedurally, because they did not raise this argument in the trial court, and substantively, because the Leasing Co. accepted the benefits of the Lease and allowed White to exercise his option to purchase the truck while knowing about and failing to assert the claimed events of default. *See 94th Aero Squadron of Memphis, Inc. v. Memphis-Shelby County Airport Auth.*, 169 S.W.3d 627, 635-36 (Tenn. Ct. App. 2004) (citing 17 Am. Jur.2d *Contracts* § 447 (1964)). Thus, White argues, the trial court correctly granted summary judgment in his favor.

The resolution of these issues must begin with the interpretation of the Lease. The interpretation of a contract is a question of law, which this Court reviews *de novo* without a presumption of correctness. *Allstate Ins. Co. v. Tarrant*, 363 S.W.3d 508, 526-27 (Tenn. 2012) (citing *Guiliano v. Cleo*, *Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999)). The cardinal rule of contract interpretation is to ascertain and give effect to the intention of the parties. *Christenberry v. Tipton*, 160 S.W.3d 487, 494 (Tenn. 2005). In interpreting a contract, we first look to the ordinary meaning of the language in the contract and determine whether the language is ambiguous. *84 Lumber Co. v. Smith*, 356 S.W.3d 380, 383 (Tenn. 2011); *Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 889-90 (Tenn. 2002). If the contract language is clear and unambiguous, "the literal interpretation of the language controls the outcome of the contract disputes," and we must enforce the contract as written. *Planters Gin Co.*, 78 S.W.3d at 890; *see Union Realty Co., Ltd. v. Family Dollar Stores of Tenn., Inc.*, 255 S.W.3d 586, 591 (Tenn. Ct. App. 2007) (citing *Int'l Flight Ctr. v. City of Murfreesboro*, 45 S.W.3d 565, 570 (Tenn. Ct. App. 2000)). If the language at issue is ambiguous — that is, if its meaning is uncertain and is susceptible to more than one reasonable interpretation — the ambiguity is generally construed against the drafter of the contract. *See Hanover Ins. Co. v. Haney*, 425 S.W.2d 590, 592 (Tenn. 1968); *Realty Shop, Inc. v. RR Westminster Holding, Inc.*, 7 S.W.3d 581, 598 (Tenn. Ct. App. 1999). All provisions of the contract should be construed in harmony, "if such construction can be

reasonably made, so as to avoid repugnancy between the several provisions of a single contract." **Rainey v. Stansell**, 836 S.W.2d 117, 119 (Tenn. Ct. App. 1992).

As quoted above, Paragraph 24 of the Lease gave White the option to purchase the truck at the end of the Lease by paying the residual value of the truck, which was $22,908.60 according to Schedule A. White forfeited the option to purchase, however, if he failed "to have all payments required under this Lease paid in full at the end of this Lease." According to Schedule A, the "end of this Lease" occurred 48 months after the Lease was executed. Under the plain terms of the contract, if White had not made "all payments required under this Lease" at that time, his option to purchase the truck was forfeited.

The facts surrounding this issue are undisputed. The parties admit, and the weekly settlement sheets reflect, that at the end of the Lease, White had accrued a debt to the Hauling Co. of more than $2,200, through the advances made to him to satisfy his obligations under the Lease. Nevertheless, the Defendants did not enforce the forfeiture provision in Paragraph 24, and they did not tell White that he would not be permitted to exercise his option to purchase the truck because of his debt. Instead, White was allowed to "pay" the residual value of the truck over the next year by actually *increasing* the amount of money that he owed to the Hauling Co.[16] Gatlin admitted that the company "loaned [White] the money to make his truck payments is how he paid that part of the contract off."

The timing of the Defendants' assertion of White's alleged "events of default" is critical. All of the "Events of Default" on which the Defendants rely occurred during the original 48-month term of the Lease. During that time, it is undisputed that the Defendants had knowledge of all of the relevant facts. Rather than asserting White's default as a basis for terminating the Lease, and thus precluding White from exercising his option to purchase the truck, the Defendants instead chose to allow White to pay the residual value of the truck. Not only that, the Defendants ranged well outside the terms of the Lease and made arrangements for White's payments to be made through weekly payroll deductions over a one-year period.

The Defendants seek to assert the first-to-breach rule, namely: "A party who has materially breached a contract is not entitled to damages stemming from the other party's later material

---

[16]On appeal, the Defendants claim that "White never exercised his option to purchase" the truck, because he "could not exercise his option to purchase [the truck] pursuant to the Lease until he had satisfied the balance owed to [the Hauling Co.] under the Lease and under the [Work Agreement]." This statement mischaracterizes the facts and the plain language of the Lease. First, Paragraph 24 of the Lease provides that White forfeits his option to purchase the truck if he fails to satisfy all payments due under the *Lease*, not the Work Agreement. Second, the Leasing Co. permitted White to exercise his option to purchase the truck, indeed facilitated it by having the residual value of the truck deducted from White's paycheck over a one-year term. This argument is without merit.

breach of the same contract." ***McClain v. Kimbrough Constr. Co.***, 806 S.W.2d 194, 199 (Tenn. Ct. App. 1990). We note, however, that "[a] party owed performance may . . . waive its right to assert the first uncured material breach as a bar to recovery on its own subsequent breach." ***Madden Phillips Constr., Inc. v. GGAT Dev. Corp.***, 315 S.W.3d 800, 812 (Tenn. Ct. App. 2009). A party "waive[s] its right to assert first material breach as a bar to recovery if it accepts the benefits of the contract with knowledge of the breach." ***Id.*** at 813. Under some circumstances, a party's failure to assert the "first" breach may not result in waiver. In ***Madden Phillips Constr.***, the Court explained this principle and gave examples of situations in which a party's failure to assert a breach may not result in waiver:

> Ordinarily, a party who first materially breaches may not recover under the contract. ***United Brake Sys.***, 963 S.W.2d at 756. A non-breaching party may nevertheless waive its right to assert first material breach as a bar to recovery if it accepts the benefits of the contract with knowledge of a breach. ***Aero Squadron***, 169 S.W.3d at 635-36 (citing 17 Am. Jur.2d *Contracts* § 447 (1964)); ***see also SMR Techs., Inc. v. Aircraft Parts Int'l Combs, Inc.***, 141 F. Supp.2d 923, 934 (W.D. Tenn. 2001), *vacated for lack of subject matter jurisdiction*, No. 00-2563, 2004 WL 595010 (W.D. Tenn. Mar. 23, 2004). But there are circumstances where acceptance of contractual benefits does not constitute waiver. For example:

>> *[M]ere efforts on the part of an innocent party to persuade the promisor, who repudiates his agreement, to reject that repudiation and proceed honorably in the performance of his agreement have been held not to involve a waiver of the innocent party's right to avail himself of the breach after the efforts finally prove unsuccessful.* Moreover, it has been held that the fact that a party did not act upon a breach but negotiated with the other party for a new contract does not constitute an acquiescence in the breach where such action was induced by misrepresentation by such other party. A defendant is precluded from claiming a waiver of breach of contract where he fraudulently induces the plaintiff to permit him to continue and thereafter violates the promises he made to induce the plaintiff to give such permission.

> ***W.F. Holt Co. v. A & E Elec. Co.***, 665 S.W.2d 722, 733-34 (Tenn. Ct. App. 1983) (alteration in original) (quoting 17 Am. Jur.2d Contracts § 447 (1964)).

*Id.* at 813. Thus, where a party to a contract fails to assert the other party's breach for reasons such as fraudulent inducement or the party's attempt to convince the breaching party to comply with the contract, the failure to assert the breach may not constitute waiver.

Here, the Defendants have pointed to no such circumstances justifying their failure to assert White's alleged multiple events of default. The Defendants assert that White was in default because he breached the Work Agreement, because he owed money to the Hauling Co. at the end of the Lease, and because he became insolvent and filed bankruptcy proceedings. If so, it is also undisputed that the Defendants knew all of these facts at the end of the original Lease term. They knew White owed money to the Hauling Co. because they sent him the settlement sheets with the amount of his debt, and Gatlin admitted he realized at the end of the original lease period that White was "behind on his payments substantially." The Defendants knew White had filed bankruptcy because, as admitted by Chatman, a portion of White's compensation had to be paid into the bankruptcy court under White's bankruptcy plan.[17] Despite having knowledge of these facts, at the end of the original lease period, the Defendants did not terminate the Lease; they allowed White to exercise his option to purchase the truck, and even arranged to accept his payment of the vehicle's residual value through payroll deductions over the course of the next year. During that time, White was responsible for all of the expenses of owning the truck, such as fuel, maintenance, and repairs, and "paid" for these expenses through payroll deductions, *i.e.*, accruing more debt to the Defendants. Based on these undisputed facts, the Defendants' failure to enforce the events of default on which they now rely constituted a waiver of their right to assert that White is barred from recovery because of his first material breach.

The Defendants argue that Paragraph 18 of the Lease precludes White from asserting waiver on their part. Paragraph 18 sets out the remedies available to the Leasing Co. in the event of White's default, and ends with this sentence: "A waiver of a default shall not be a waiver of any other or a subsequent default." This paragraph is no help to the Defendants, because White does not assert that waiver of one event of default should be deemed to be a waiver of all. Under the undisputed facts in this case, the Leasing Co. knew all of the material facts regarding each and every event of default on which it now seeks to rely, and it failed to assert any of them at the end of the original lease period. Thus, it independently waived each one of the claimed events of default when it allowed White to exercise his option to purchase the truck at the end of the lease period. Therefore, this provision is of no avail to the Defendants.

The trial court granted summary judgment to White on this claim, and it denied the Defendants' motion for summary judgment, but not on the basis of waiver. The appellate court may affirm the trial court's grant of summary judgment on different grounds. ***Hill v.***

---

[17]Chatman said that she was not aware that White's bankruptcy petition constituted an event of default.

***Lamberth***, 73 S.W.3d 131, 136 (Tenn. Ct. App. 2001). For the reason we have discussed above, we affirm the trial court's grant of summary judgment to White on his breach-of-contract claim and its denial of the Defendants' motion for summary judgment on this claim.[18]

## Summary Judgment – Conversion & TCPA

The Defendants seek to appeal the trial court's denial of their motion for summary judgment on White's conversion and TCPA claims. The trial court denied the Defendants' summary judgment motion on the basis that genuine issues of material fact remained as to these claims. Subsequently, a trial was held, and the trial court rendered a judgment in favor of White on these claims. "[T]his Court is precluded from entertaining, as alleged error, the trial court's denial of a summary judgment motion (predicated on the existence of a genuine issue of material fact) when the case proceeds to a trial on the merits and a judgment is subsequently rendered." ***Cortez v. Alutech, Inc.***, 941 S.W.2d 891, 893 (Tenn. Ct. App. 1996). Thus, the Defendants' issues pertaining to the trial court's denial of their motion for summary judgment on the conversion and TCPA claims are not reviewable on appeal, and we decline to address them. ***See Travis v. Trustees of Lakewood Park***, No. M2009-01935-COA-R3-CV, 2010 WL 3488522, at *3 (Tenn. Ct. App. Sept. 3, 2010) (citing ***Cortez***, 941 S.W.2d at 893).

## Summary Judgment — Counterclaim for Attorney Fees

The Defendants argue that the trial court erred in denying their motion for summary judgment as to their counterclaim for attorney fees. The Defendants' counterclaim was based on the following provision in the Lease: "[White] agrees to pay all expenses incurred by [the Leasing Co.] in enforcing its rights after the occurrence of any event of default hereunder, including the reasonable fees of any attorneys retained by [the Leasing Co.] . . . ." The trial court dismissed the Defendants' counterclaim for attorney fees "[b]ecause they are defendants, rather than plaintiffs," and "they are being required to defend their own actions rather than seeking to enforce their rights as provided in the language of the Equipment Lease."[19]

---

[18]This holding herein pretermits many of the arguments raised on appeal by the Defendants, including their argument that the Leasing Co. is a third-party beneficiary of the Work Agreement, and that the Hauling Co. is a third-party beneficiary of the Lease.

[19]This issue is reviewable on appeal because the trial court denied summary judgment on this counterclaim based on its interpretation of the Lease, not based upon a finding that genuine issues of material fact existed for trial.

We agree with the trial court. Moreover, our holding above, that the Leasing Co. in fact breached the Lease, renders the Defendants' argument untenable. For these reasons, we reject the Defendants' claim that the trial court erred in denying their motion for summary judgment on this claim.

## Evidence About White's Bankruptcy

The Defendants argue that the trial court erred in refusing to permit them to question White at trial about his 2005 bankruptcy and his bankruptcy petition. They claim that this evidence was relevant not only to White's default under the Lease, but also to White's credibility as a witness and to their defense of judicial estoppel.

Our holding that the Defendants waived their right to assert White's bankruptcy as a default obviates the Defendants' argument that they should have been permitted to question White about his bankruptcy to establish that it constituted an event of default. Whether the questioning should have been permitted for the purpose of impeaching White's credibility, however, is another issue.

At trial, the Defendants asserted: "There are statements made in [White's] bankruptcy petition that he had no lease contract, no exculpatory contracts [when] . . . in fact he did have a lease, and so he lied to the Federal Government in the filing of his bankruptcy Petition." White objected to the admission of the bankruptcy petition into evidence, arguing that it was irrelevant because the filing of the bankruptcy petition was stipulated, and it was undisputed that the Defendants knew about the bankruptcy petition because the Hauling Co. had garnished his wages. The trial court sustained White's objection.

We agree with the Defendants that "[a] witness's credibility is always relevant" at trial. *State v. Byrd*, No. E2009-02091-CCA-R3-CD, 2010 WL 4622009, at *5 (Tenn. Crim. Ct. App. Nov. 15, 2010). However, the question for this appellate court is not whether we would have made the same evidentiary ruling the trial court made; the question for us is whether the trial court abused its broad discretion in evidentiary matters. *Pullum,* 174 S.W.3d at 137. We find that the trial court had a reasonable basis for its ruling. Under the totality of the circumstances, we find that the trial court did not abuse its discretion in declining to allow the Defendants to question White on his bankruptcy for purposes of impeachment or judicial estoppel.

## Motion for Involuntary Dismissal

The Defendants next argue that the trial court erred in denying its motion under Tennessee Rule of Civil Procedure 41.02(2) for involuntary dismissal of White's conversion and TCPA

claims at the close of White's proof. "Following the denial of a Tenn. R. Civ. P 41.02(2) motion, the moving party may stand on its motion and bring an appeal or present its evidence; it cannot do both." *Adelsperger v. Adelsperger*, 970 S.W.2d 482, 484 (Tenn. Ct. App. 1997); *see In re Thomas P.*, No. E2005-01367-COA-R3-PT, 2006 WL 1491610, at *7 (Tenn. Ct. App. May 31, 2006). After the trial court denied the Defendants' motion for involuntary dismissal, the Defendants put on their proof and the case proceeded to judgment. Under the rule announced in *Adelsperger*, we decline to address this issue on appeal.

## Trial Court's Decision Following the Bench Trial

The Defendants argue that the trial court's findings in favor of White on all of his claims were not supported by a preponderance of the evidence at trial. We will address each claim in turn.

### *Breach of Contract*

The Defendants argue that, despite the pretrial grant of summary judgment in favor of White on his breach-of-contract claim, the trial court remained free to revise its ruling on this issue based on the evidence presented at trial. Relevant to White's breach-of-contract claim, the Defendants maintain that the following specific factual findings by the trial court were not supported by the weight of the evidence at trial:

> 13. Before White began participating in the lease-purchase program, Gatlin explained to White that all he had to do in order to receive title to the tractor-trailer was make all 48 payments under the lease-purchase agreement and then pay the residual value of the tractor-trailer.
> 14. When explaining the lease-purchase program to White, Gatlin did not inform him that, in addition to paying all of the payments due under the lease-purchase contract, the Leasing Company would not transfer title to the tractor-trailer to him until he repaid any money owed to the Hauling Company.
>
> 20. White made all 48 lease payments of $1,909.05 under the Equipment Lease for a total amount of $91,634.40.
> 21. White also paid the residual balance of $22,908.60 under the Equipment Lease via weekly payments of $468.23 over an additional term of approximately one year.

In addition, the Defendants contend that the trial court made the erroneous legal conclusion that White could recover for breach of contract, because the evidence at trial showed that White was the first to breach the Lease.

From our review, the evidence presented at trial on White's breach-of-contract claim was consistent with the undisputed evidence presented to the trial court in connection with White's motion for summary judgment on this claim. Thus, the factual findings that the Defendants question on appeal are an accurate assessment of the evidence — both the evidence presented at the summary judgment stage and the evidence presented at trial. Moreover, we have held that the Defendants are precluded from arguing that White was the first to breach because they waived their right to assert White's defaults under the Lease. Therefore, we must respectfully reject this argument as well.

### *Conversion*

The Defendants contend that, when the truck was repossessed by the Defendants, White was not the owner of the truck, in law or in equity, so the Defendants cannot be held liable for conversion of the truck. The elements of a conversion claim include: (1) an appropriation of another's tangible property to one's use and benefit; (2) an intentional exercise of dominion over the chattel alleged to have been converted; and (3) defiance of the true owner's rights to the chattel. *River Park Hosp., Inc. v. Blue Cross Blue Shield of Tenn., Inc.*, 173 S.W.3d 43, 60 (Tenn. Ct. App. 2002). "A wrongful intent on the part of the defendant is not an element of conversion and, therefore, need not be proved." *PNC Multifamily Capital Institutional Fund XXVI Ltd. P'ship v. Bluff City Cmty. Dev. Corp.*, No. W2011-00325-COA-R3-CV, 2012 WL 1572130, at *22 (Tenn. Ct. App. May 4, 2012). A conversion claim focuses on "the interference with a property owner's right." *Gen. Elec. Credit Corp. of Tenn. v. Kelly & Dearing Aviation*, 765 S.W.2d 750, 754 (Tenn. Ct. App. 1988).

The Defendants' reasoning on this issue is premised on the argument that we rejected above, namely, that White was in default under the Lease. Based on this presupposition, the Defendants contend that they acted lawfully in repossessing property that rightfully belonged to them. We have held that the Defendants waived their right to assert White's alleged defaults under the Lease, so the Defendants breached the Lease, not White. Therefore, under the terms of the Lease, White was the lawful owner of the truck, and the Defendants exercised dominion and control over the truck in defiance of White's rights. For this reason, we affirm the trial court holding that the Defendants were liable to White for conversion of the truck.

### *Punitive Damages*

The Defendants argue that the trial court erred in awarding punitive damages on White's conversion claim. They contend that punitive damages were not appropriate in this case, because the evidence shows that, when Gatlin had the truck repossessed from White, Gatlin

believed that he was acting within his contractual rights. The Defendants acknowledge that Gatlin's decision was intentional in the sense that he intended to take possession of the truck, but claim that there was no evidence whatsoever that he acted with the intent to violate any of White's property rights or cause him harm. The evidence shows, the Defendants contend, that if Gatlin made a mistake as to the Defendants' rights under the Lease and the Work Agreement, it was an honest mistake, and the Defendants believed that they had a legal right to self-help repossession under the terms of the Lease. In response, White maintains that the evidence clearly and convincingly establishes the Defendants' intentional disregard for his property rights and their malicious conversion of his truck.

In reviewing the award of punitive damages in this case, we are mindful of the standard for such an award. The trial court may award punitive damages if it finds, by clear and convincing evidence, that a defendant's wrongful actions were intentional, fraudulent, malicious, or reckless. *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 (Tenn. 1992). To establish his claim for punitive damages for the Defendants' conversion, White was required to show, by clear and convincing evidence, that the conversion of the truck "was accompanied by malice, insult, reckless and willful disregard of the plaintiff's rights, or other proof showing the aggravated nature of the act." E. LeFevre, *Punitive or Exemplary Damages for Conversion of Personalty by One Other Than Chattel Mortgagee or Conditional Seller*, 54 A.L.R.2d 1361 § 2 (1957 & Cum. Supp.) (cases cited therein); *see also* 18 Am. Jur. 2d *Conversion* § 125 (2004) ("Generally speaking, punitive damages may be allowed in a conversion action when the conversion involves elements of fraud, ill will, malice, recklessness, wantonness, oppression, insult, willful or conscious disregard of the plaintiff's rights, or other aggravating circumstances." (Footnotes omitted)).
Clear and convincing evidence leaves "no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hodges*, 833 S.W.2d at 901 n.3. "In contrast to the preponderance of the evidence standard, clear and convincing evidence should demonstrate that the truth of the facts asserted is 'highly probable' as opposed to merely 'more probable' than not." *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005) (quoting *In re C.W.W.*, 37 S.W.3d 467, 474 (Tenn. Ct. App. 2000)); *see Teter v. Republic Parking Sys., Inc.*, 181 S.W.3d 330, 341 (Tenn. 2005) (noting that the clear and convincing standard "is used to promote important public policy and preserve prior judicial orders" and "in circumstances involving extraordinary remedies").

The question of whether the record contains clear and convincing evidence to support the trial court's decision is a question of law, reviewed on appeal by applying the following standard:

> Under [the clear and convincing] standard of proof, the appellate court must "distinguish between the specific facts found by the trial court and the

-27-

combined weight of those facts." The facts as found by the trial court are reviewed *de novo* on the record, presuming those findings to be correct unless the evidence preponderates otherwise. Findings of fact based on witness credibility are given great deference and will not be disturbed absent clear evidence to the contrary. Whether the combined weight of the facts, either as found by the trial court or supported by a preponderance of the evidence, establish clearly and convincingly that [punitive damages are warranted] is a question of law, subject to *de novo* review with no presumption of correctness.

*In re Samaria S.*, 347 S.W.3d 188, 200 (Tenn. Ct. App. 2011) (involving allegations of severe child abuse, which must be proven by clear and convincing evidence; citations omitted).

Thus, given our standard of review, we first must ascertain whether the findings of fact underlying the punitive damages award are supported by a preponderance of the evidence. After that, we determine whether the combined weight of those facts, either as found by the trial court or supported by a preponderance of the evidence, clearly and convincingly establish that the Defendants' conversion of White's truck was accompanied by the aggravating circumstances required for punitive damages.

In making its findings on punitive damages, the trial court acknowledged the standard, *i.e.*, clear and convincing evidence that the defendant acted intentionally, fraudulently, maliciously, or recklessly. It then stated: "The Court finds, by clear and convincing evidence, that it was the Defendants' conscious objective and desire that White never obtain title to the tractor-trailer and the Defendants' conversion of White's tractor-trailer was retaliatory in nature." It explained that the retaliation was "for White rejecting Gatlin's proposal" that White revert to being a company driver "and for White arranging to go to work for another carrier." Elsewhere in the order, the trial court found that it was "deceptive and unfair" for the Defendants to use one corporate entity to collect the debts of another corporate entity, for Gatlin not to tell White in their initial discussion of the lease-purchase arrangement that he would have to pay his debt to the Hauling Co. in order to take title to the truck, and for Gatlin not to tell White at the end of the original lease period that he would have to pay his debt to the Hauling Co. to take title to the truck. Although these findings were made in connection with the trial court's discussion of White's TCPA claim, they may be interpreted as a finding of fraud that would support an award of punitive damages. We will examine the evidence supporting all of these factual findings, focusing first on the retaliation, then on the finding of deception or fraud, and finally on the Defendants' desire that White never obtain title to the truck, to determine whether they are supported by a preponderance of the evidence. Then we will look at the combined weight of the facts to determine whether they meet the standard for punitive damages.

-28-

Looking at the evidence on the trial court's factual finding that Gatlin's repossession of the truck was motivated in part by retaliation, we find that the preponderance of the evidence supports the trial court's finding. As emphasized by the trial court, Gatlin admitted that he decided to repossess the truck immediately after White called to tell Gatlin that White did not want to revert to being a company driver, and instead wanted to drive for an out-of-state carrier. Gatlin said that "there was no need to talk to [White] anymore. . . . I was a little upset with him frankly." This testimony supports the trial court's finding that Gatlin's repossession of the truck was partly driven by a desire to punish White for refusing his offer to become a company driver and for threatening to take the truck out of the state.

We next examine the trial court's factual finding that the Defendants engaged in acts that were deceptive. The trial court's order indicates that the trial court felt that White had been duped by the Defendants; its recitation of the evidence notes that Gatlin was an educated, experienced businessman, while White had limited education and little business experience; it also emphasizes the fact that, prior to White's execution of the Lease, "Gatlin told White . . . that all White had to do to become the owner of the tractor-trailer was to make all of the lease payments and pay the residual value of the tractor-trailer." The trial court then found: "Gatlin, however, never intended to transfer title to the tractor-trailer to White until White also satisfied his alleged debt to the Hauling Company under the [Work] Agreement. Further, Gatlin never informed White of this supposed further obligation to the Hauling Company until after White had satisfied all of his obligations to purchase the tractor-trailer under the Equipment Lease." The trial court found that this constituted "acts that were . . . deceptive on the front end and deceptive and unfair at the completion of White's payments due under the Equipment Lease." It found specifically that "Gatlin's use of one corporate entity to enforce the contractual rights of a separate corporate entity was a deceptive and unfair act . . . ."

The statements by the trial court in its order indicate skepticism about the Defendants' claim that the Lease required White to satisfy any outstanding debt to the Hauling Co. before he could exercise his option to purchase the truck. Nevertheless, the trial court did not make an explicit finding as to whether this requirement was indeed part of the Lease. We assume, without deciding, that the satisfaction of White's debt to the Hauling Co. was a precondition under the Lease. If Gatlin's failure to discuss this alleged precondition with White was an effort to hide it from White, he did not succeed. White testified in his pretrial deposition that he understood that he had a contractual duty to pay all amounts due to "Empire," indicating both companies, as a precondition to getting title to the truck:

> [Q:] . . . . So up until the time you got title to the truck, am I correct
> that under the contract, as you understood it, you had an obligation to pay all
> amounts due to Empire from you.

[White:] Yes.

[Q:] And the contract provided and you understood that it included a requirement that you paid all maintenance costs.

[White:] Yes.

[Q:] And those amounts must be paid under the contract up until the time that the title was transferred to you for the truck —

[White:] Yes.

[Q:] — as a condition of your getting title to the truck; correct?

[White:] Yes.

Thus, White admitted that he knew that all of his debts had to be paid before he could receive title to the truck. Moreover, White agreed that this requirement was fair:

[Q:] And you understood the deal to be that if you owed Empire any money for fixing your truck, maintaining your truck, or anything like that, that you had to pay that before you could trigger the purchase of your truck. Isn't that right?

[White:] Yes.

[Q:] And that was a fair deal, wasn't it?

[White:] Yeah, that was a fair deal.

[Q:] If you owed them money, you should have to pay them, shouldn't you; right?

[White:] Yeah.

[Q:] All right. And that was worked into as part of the [Work Agreement] and part of the [Lease] that you would have to do that before you could trigger the purchase of the truck?

...

[White:] Yes.

[Q:] And you understood that, didn't you?

[White:] Yeah.

[Q:] And you thought that was fair, didn't you?

[White:] Yeah. If I owed them money, yes.

Thus, regardless of whether the Lease provision on which the Defendants rely *actually* required White to pay his debts to the Hauling Co. before the Leasing Co. would release title to the truck, White understood that to be the arrangement and thought it was fair.

Importantly, the trial court also did not make a finding on whether White actually owed money to the Hauling Co. at the end of the original lease period, or a year later after the payments on the residual value of the truck had been made. The Defendants amended their

Answer to assert setoff and recoupment in the amount of White's alleged debt to the Hauling Co. This defense was referred to arbitration, and ultimately settled, so there was no need for the trial court to make such a finding. But the evolution of White's position on this matter is significant on the issue of fraud or deception. At the beginning of the litigation, White understood that any debt he owed to the Hauling Co. would preclude him from taking title to the truck, but he took the position that he *did not owe* any monies to the Hauling Co. Thus, in the beginning, White viewed the Defendants' refusal to give him the title to the truck as wrongful simply because he believed that he did not *have* any debt to the Hauling Co. By the time of trial, White admitted that he owed money to the Hauling Co., and after trial he settled the setoff and recoupment claim for over $20,000. Thus, by the time of trial, it was undisputed that (1) White understood that he was required to pay off any debt to the Hauling Co. before the Leasing Co. would transfer title to him, and (2) White still owed money to the Hauling Co. after all of the lease payments and the residual value of the truck were fully paid.

Under all of these circumstances, we must find that the evidence preponderates against the trial court's finding that it was deceptive for the Defendants to require White to pay any debts to the Hauling Co. before the Leasing Co. would release title of the truck to him. Likewise, it was not deceptive for one corporation to enforce the rights of another where White admits that he understood that to be the case. Thus, we do not find evidence in the record that would support a factual finding of fraud.

As further basis for its award of punitive damages, the trial court also found that "it was the Defendants' conscious objective and desire that White never obtain title to the tractor-trailer . . . ." This was not immediately explained, but later in the same order, the trial court states: "Gatlin . . . never intended to transfer title to the tractor-trailer to White until White also satisfied his alleged debt to the Hauling Co. under the [Work] Agreement." We surmise, then, that this factual finding is again based on the premise that it was deceptive or unfair for the Defendants to require White to pay his debt to the Hauling Co. before releasing title to the truck. As discussed above, White admitted that he was aware of this requirement and thought it was fair. Thus, we find that this is not a basis for an award of punitive damages.

In considering the combined weight of the facts in the record, we must also keep in mind the nature of the tort underlying the award of punitive damages. In a breach-of-contract conversion case, punitive damages are not justified if the defendant converted the property based on the belief that he could rightfully do so under the terms of a contract relating to the property.[20] *See* 54 A.L.R. 2d 1361 § 17; *see also Food Fair Stores, Inc. v. Hevey*, 338 A.2d 43, 46-47 (Md. 1975) (reversing award of punitive damages based on conversion when the

---

[20]Generally, punitive damages cannot be awarded based solely on a breach of contract.

defendant's actions were based on a rational business decision, not ill will); **Siegman v. Equitable Trust Co.**, 297 A.2d 758, 761 (Md. 1972) (holding that malice cannot be shown if the tort was "committed in the honest assertion of a supposed right without any evil intention").

The trial court did not make a specific finding on whether Gatlin believed that he had the right to repossess the truck when he directed Firmin to do so. The Defendants' evidence at trial showed that Gatlin believed that the Defendants had authority to repossess the truck. Gatlin explained his belief that Paragraph 18 of the Lease gave the Defendants the right to repossess the truck in the event of default. White proffered no evidence to the contrary; indeed, White himself testified that the Leasing Co. was entitled to repossess the truck in the event of default. White admitted that the Leasing Co. could have rightfully repossessed the truck in the early stages of the Lease due to his default, but it chose not to do so. We note that our holding that the Defendants did not have the right to repossess the truck was based on a holding that they waived any defaults by White, and not based on any finding that events of default did not occur. Therefore, the unrefuted evidence in the record supports a finding that Gatlin believed that the Defendants had the right to repossess the truck under the terms of the contract that related to the property, namely, the Lease. **See** 54 A.L.R.2d 1361 §17.

Under this record, then, the sole factual finding that supports the award of punitive damages is the trial court's finding that the Defendants were partly motivated by "retaliation for White rejecting Gatlin's proposal and for White arranging to go to work for another carrier." To "retaliate" is to "to return the like for: repay or requite in kind (as an injury) . . . [or] to put or inflict in return." WEBSTER'S THIRD NEW INT'L DICTIONARY 1938 (1993 Unabridged). In the context of an award of punitive damages, this would appear to qualify as "malice." In **Hodges**, the Supreme Court held that "[a] person acts maliciously when the person is motivated by ill will, hatred, or personal spite." **Hodges**, 833 S.W.2d at 901. In another context, "malice" is defined as "an act [that is] hurtful to another, intentional, and without legal justification." **Hutton v. Watters**, 179 S.W. 134, 135 (Tenn. 1915).

However, to determine whether there is clear and convincing evidence to support the award of punitive damages, we consider the combined weight of all of the specific facts, either as found by the trial court or as supported by the preponderance of the evidence. **In re Samaria S.,** 347 S.W.3d at 200. Along with the finding that Gatlin was partly motivated by retaliation, we also consider the fact, supported by unrefuted evidence, that Gatlin believed he was authorized under the Lease to repossess the truck from White. Thus, even if White's rejection of Gatlin's proposal angered Gatlin and triggered the repossession of the truck, Gatlin believed that he had the legal authority to do so. This is not acting with an intent to disregard White's property rights in the truck. **See Siegman**, 297 A.2d at 761; **see also Darcars Motors of Silver Spring, Inc. v. Borzym**, 841 A.2d 828, 838 (Md. 2003) (indicating

that the defendant must convert the "property with a consciousness of the wrongfulness of that conversion" to justify punitive damages based on malice).

Our Supreme Court has admonished that "punitive damages are reserved for egregious conduct," and they "do indeed represent 'strong medicine.'" *Goff v. Elmo Greer & Sons Constr. Co., Inc.*, 297 S.W.3d 175, 197 (Tenn. 2009) (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 577 (1996)). Keeping that admonition in mind, we must conclude that the combined weight of the specific facts, as found by the trial court and as supported by a preponderance of the evidence, does not amount to clear and convincing evidence to justify an award of punitive damages under the *Hodges* standard. For this reason, we must reverse the trial court's award of punitive damages to White on his claim of conversion.

### *Tennessee Consumer Protection Act*

The Defendants argue that the preponderance of the evidence at trial did not support a finding that they violated the TCPA. The TCPA creates a private right of action for "[a]ny person who suffers an ascertainable loss of money or property, real, personal or mixed, . . . as a result of the use or employment by another person of an unfair or deceptive act or practice . . . declared to be unlawful by this part." Tenn. Code Ann. § 47-18-109. In order to recover under the TCPA, White must show by a preponderance of the evidence that: (1) the Defendants engaged in an unfair or deceptive act or practice declared unlawful by the TCPA, and (2) the Defendants' conduct caused the loss of an "ascertainable amount of money." *Id.*; *see Tucker v. Sierra Builders*, 180 S.W.3d 109, 124 (Tenn. Ct. App. 2005). The terms "unfair" and "deceptive" are not defined in the TCPA. Therefore, "the standards to be used in determining whether a representation is 'unfair' or 'deceptive' under the TCPA are legal matters to be decided by the courts." *Tucker*, 180 S.W.3d at 116. Whether a specific representation in a particular case is "unfair" or "deceptive," however, is a question of fact to be reviewed under a preponderance of the evidence standard.

The trial court determined that both Defendants had engaged in practices that were unfair and/or deceptive. The trial court found:

> . . . As a co-owner and officer of the Leasing Company, Gatlin told White, prior to the execution of the Equipment Lease, that all White had to do to become the owner of the tractor-trailer was to make all of the lease payments and pay the residual value of the tractor-trailer. Gatlin, however, never intended to transfer title to the tractor-trailer to White until White also satisfied his alleged debt to the Hauling Company under the Hauling Agreement. Further, Gatlin never informed White of this supposed further obligation to the Hauling Company until after White had satisfied all of his

-33-

obligations to purchase the tractor-trailer under the Equipment Lease. Thus, the Defendants engaged in acts that were both deceptive on the front end and deceptive and unfair at the completion of White's payments due under the Equipment Lease.

Additionally, Gatlin, as a co-owner and an officer of the Hauling Company, withheld title to the tractor-trailer from White in an attempt to collect an alleged debt owed by White to the Hauling Company. Gatlin's withholding of title from White and Firmin's subsequent conversion of the tractor-trailer at Gatlin's direction were in violation of White's agreement with the Leasing Company. Essentially, Gatlin refused to perform the Leasing Company's obligations under the Equipment Lease and converted White's tractor-trailer in an attempt to collect White's alleged debt to the Hauling Company. Gatlin's use of one corporate entity to enforce the contractual rights of a separate corporate entity was a deceptive and unfair act under the TCPA.

As we have discussed above, even if Gatlin failed to specifically tell White of his "further obligation" when he signed the lease-purchase agreements, White testified in his deposition that he knew that paying all of his debts to "Empire," that is, both companies, was a precondition to obtaining title to the truck. White conceded that he thought this was a fair arrangement. Under these circumstances, Gatlin's failure to talk to White about this obligation, either on the "front end" or at the end of the original lease period, was not deceptive.

The trial court also found that Gatlin withheld title to the truck from White in an attempt to collect the debt White owed to the Hauling Co., and that the act of using "one corporate entity to enforce the contractual rights of a separate corporate entity was a deceptive and unfair act under the TCPA." We respectfully disagree. First, the Lease and the Work Agreement are, by their terms, interrelated documents. The Lease required White to "pledge a contract with a regulated motor carrier . . . to secure the lease payments," and also listed as an event of default White's breach of "any other instrument or agreement delivered by [White] to . . . any affiliate of [the Leasing Co.]," both apparent references to the Work Agreement. Furthermore, the Work Agreement and the Direct Pay Authorization give the Hauling Co. the right to deduct amounts from White's earnings to pay either of the Defendants any amount due from White. All of the documents — the Lease, the Work Agreement, and the Direct Pay Authorization — were signed as part of the lease-purchase program. The contractual terms referring to other agreements were not concealed from White. White has cited no authority to suggest that an interrelationship among contracts and entities is inherently unfair or deceptive. In these particular circumstances, White admittedly *understood* the documents and felt that they were fair. White was asked at trial whether it was fair that he was not entitled to have title to the truck unless "all the bills were paid . . .

[t]o [the Hauling Co.] and [the Leasing Co.] . . . All bills. The payments and all that maintenance." White responded, "Yes, I thought it was a fair agreement . . . [i]f they would hold up their end of the bargain." White also acknowledged that the Defendants never denied any request for an advance of funds to pay his personal bills, and that, until the lawsuit arose, the Defendants never accelerated his debt or held him in default under the Lease.

Under all of these circumstances, we must conclude that the evidence preponderates against a finding that the Defendants engaged in a "deceptive act or practice" within the meaning of the TCPA. We must respectfully reverse the trial court's finding in White's favor on his claim under the TCPA.

### *Attorney Fees Under the TCPA*

The Defendants argue that they should have been awarded attorney fees under the TCPA, because White's TCPA claim was "frivolous, without legal or factual merit, or brought for the purpose of harassment." Tenn. Code Ann. § 47-18-109(e)(2). It is within this Court's discretion to determine whether to award fees under this provision. *Glanton v. Bob Parks Realty*, No. M2003-01144-COA-R3-CV, 2005 WL 1021559, at *9 (Tenn. Ct. App. Apr. 27, 2005). We find that White's TCPA claim does not meet the standard in Section 47-18-109(e)(2), and that an award of attorney fees in favor of the Defendants on White's TCPA claim is not warranted.

### CONCLUSION

In sum, we affirm the grant of White's motion for summary judgment on his breach-of-contract claim, affirm the denial of the Defendant's claim for attorney fees under the relevant provision in the Lease, affirm the refusal to admit evidence of White's bankruptcy at trial, and affirm the trial court's finding in favor of White on his conversion claim after trial. We reverse, however, the trial court's award of punitive damages based on the Defendants' conversion of the truck, and we reverse the trial court's finding that the Defendants violated the TCPA. In addition, we deny the Defendants' request for attorney fees under the TCPA. All other issues that were not specifically addressed herein are either not reviewable by this Court or are pretermitted by our decision.

The decision of the trial court is affirmed in part, reversed in part, and remanded for further proceedings consistent with this Opinion. Costs on appeal are to be taxed one-half to Defendants/Appellants Empire Express, Inc., Empire Transportation, Inc., and their surety, and one-half to Plaintiff/Appellee David White, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE