IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
November 7, 2018 Session

## MCKAYLA TAYLOR v. MIRIAM'S PROMISE ET AL.

Appeal from the Circuit Court for Putnam County
No. 2017-CV-123    Amy V. Hollars, Judge

_____

### No. M2017-01908-COA-R3-CV

_____

This action arises from an agreed-upon adoption that the birth mother revoked within 30 days of the child's birth. The defendants include three adoption agencies, three social workers, two attorneys, a hospital, and the prospective adoptive parents. Generally stated, the complaint alleges that the defendants acted in concert to abduct the mother's child by inducing the mother to surrender her parental rights, consent to the adoption, and waive her right of revocation. The articulated claims include conspiracy to commit fraud and tortious civil kidnapping, negligence, professional negligence, healthcare liability, and conversion of her child. All defendants filed motions to dismiss the complaint under Tennessee Rule of Civil Procedure 12.02 for some or all of the following reasons: (1) the adoption documents were valid under Tennessee law and not fraudulent; (2) Tennessee does not recognize the torts of civil kidnapping and conversion of a child; (3) the claims are time-barred; (4) the mother's first certificate of good faith was non-compliant because it did not disclose a prior violation of Tennessee Code Annotated § 29-26-122; (5) the Tennessee Governmental Tort Liability Act barred the mother's intentional tort claims against the hospital; and (6) the mother released some of the defendants from liability by signing a release agreement. Additionally, the healthcare providers contended the complaint should be dismissed because the mother failed to comply with the pre-suit notice requirement of the Tennessee Health Care Liability Act. The trial court granted the motions on various grounds and dismissed the complaint with prejudice for all defendants. Having determined that Tennessee does not recognize a tort of conversion of a child or tortious civil kidnapping and that conspiracy to commit fraud is not a stand-alone claim, we affirm the dismissal of these claims. We also affirm the dismissal of all remaining claims as time-barred. Therefore, the judgment of the trial court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

FRANK G. CLEMENT JR., P.J., M.S., delivered the opinion of the Court, in which ANDY D. BENNETT and W. NEAL MCBRAYER, JJ., joined.

Connie Reguli, Brentwood, Tennessee, for the appellant, McKayla Alexis Taylor.

Michael Gregory Derrick, Memphis, Tennessee, for the appellees, AdoptHelp, Inc., Adoption Planners, Inc., Mark Goldman, Gabby Rivette, and Steve Wang.

Samantha Erin Bennett, Raleigh Kent Francis, Peter Benjamin Winterburn, Memphis, Tennessee, for the appellees, Allison Balthrop, Sarah Groth, and Miriam's Promise.

Cynthia A. Wilson, Cookeville, Tennessee, for the appellees Cookeville Regional Medical Center Authority and Kellye Ann Reid.

Rachel Thomas, Nashville, Tennessee, for the appellees Paul and Roberta Paetzke.

# OPINION

## FACTUAL AND PROCEDURAL HISTORY

Because this case was dismissed by the trial court upon the defendants' motions under Tennessee Rule of Civil Procedure 12.02(6), our only source of the relevant facts is the Complaint. Therefore, the factual history stated below is taken from the allegations in the Complaint. The procedural history is taken from the record provided by the trial court.

### I. PLAINTIFF'S PREGNANCY

McKayla Taylor ("Plaintiff") has been a Tennessee resident at all times material to this action. In the spring of 2015, Plaintiff learned that she was pregnant. Plaintiff was willing to complete the pregnancy and raise the child, but the biological father discouraged this path. Over the next few months, and after numerous conferences with the biological father and his mother, Plaintiff agreed to consider adoption.[1]

Following a Google search for adoption options, Plaintiff sent an email to Gabby Rivette, the director and caseworker at Adoption Planners, Inc., an adoption agency in California. After some communications with Ms. Rivette, Plaintiff approved California residents Paul and Roberta Paetzke to be the adoptive parents. The Complaint alleges that

---

[1] Plaintiff was not residing with the father when she became pregnant; however, she moved in with the father during the last few months before the birth of the child.

the Paetzkes were represented by California attorney Mark Goldman, who was the principal of Adoption Planners and an affiliated entity, AdoptHelp, Inc.[2]

On October 26, 2015, Ms. Rivette sent Plaintiff an email stating that she would be contacting a "TN attorney and social worker" to set up an "advisement" meeting for Plaintiff. Ms. Rivette then contacted a Tennessee adoption agency, Miriam's Promise, to set up the advisement meeting.

On October 31, 2015, the child's father executed a Waiver of Right of Further Notice of Adoption Planning that stated, "[T]he court may enter an order terminating my parental rights without further notice to me." The Complaint alleges that the Paetzkes' California attorney, either personally or through Ms. Rivette, provided Miriam's Promise with this and other legal documents published by the State of California to obtain the surrender of parental rights and consent to the adoption.

On November 2, 2015, Ms. Rivette sent Plaintiff an email stating, "I am working with the TN agency Miriam's Promise to set up your [advisement] meeting." On November 11, 2015, Ms. Rivette sent Plaintiff another email asking her to meet with Sarah Groth, a Miriam's Promise employee and licensed social worker in Tennessee:

> I wanted to check in to see if you are able to meet with Sarah tomorrow or Friday during the day (maybe in between classes or on a lunch break)? The advisement (your meeting with her) is the next step in the adoption process and it is a very crucial one. This is where you'll learn your rights as a birth mother, learn the specific information about [the adoptive parents] that you legally need to know and receive a copy of the documents that you'll be signing after the baby is born.

Ms. Rivette informed Plaintiff that this meeting had to occur ten days before Plaintiff's discharge from the hospital.

At the advisement meeting, Sarah Groth with Miriam's Promise asked Plaintiff to sign a Statement of Understanding. The Statement of Understanding provided, *inter alia*, that Plaintiff had a right to revoke her consent to the adoption for 30 days after signing the final surrender and consent agreement. Plaintiff signed the Statement of Understanding, but Ms. Groth did not provide Plaintiff with a copy of the document or

---

[2] The record indicates that Mr. Goldman practiced law with co-defendant Steven Wang under the firm name of Adoption Law Center. The Complaint incorrectly spells Mr. Wang's last name as "Want."

the final surrender and consent agreements that Plaintiff would be signing after giving birth.

On November 27, 2015, Plaintiff was admitted to Cookeville Regional Medical Center ("Cookeville Regional") to give birth. After Plaintiff was administered medication, Cookeville Regional employee and licensed social worker, Kellye Reid asked Plaintiff to execute a Maternal Preference Check Sheet. The Check Sheet gave Plaintiff options for the care of the child after birth, such as whether she wanted to see the child or receive information about the child's condition. After Plaintiff gave birth, but while still medicated, Ms. Reid asked Plaintiff to execute two more agreements. The first agreement permitted the Paetzkes to "feed, bathe and bond with" the child. The second agreement authorized Cookeville Regional to discharge the child into the Paetzkes' custody and agreed to hold Cookeville Regional harmless from any claims for doing so.

The next day, November 28, 2015, Cookeville Regional discharged the child into the Paetzkes' custody.

On November 29, 2015, Plaintiff was discharged from the hospital. On December 1, 2015, while Plaintiff remained under the influence of pain medication, another Miriam's Promise employee and licensed social worker, Allison Balthrop, asked Plaintiff to execute a second Statement of Understanding, a Waiver of Right to Revoke Consent, and an Adoption Placement Agreement. The Placement Agreement provided that Plaintiff was surrendering her parental rights and consenting to the adoption. The Waiver provided that Plaintiff was waiving her 30-day right to revoke the Placement Agreement. Ms. Balthrop did not explain the documents to Plaintiff or ask if Plaintiff was under the influence of medication. Miriam's Promise did not provide or offer any post-partum counseling or provide Plaintiff with copies of the signed documents.

On December 4, 2015, Plaintiff decided that she wanted the child returned to her. When she informed Ms. Rivette of her decision to keep the child, Ms. Rivette advised Plaintiff there was nothing she could do because Plaintiff waived the 30-day revocation period. Undeterred, Plaintiff contacted Miriam's Promise and was told that the original documents were sent to Adoption Planners in California and that copies of the documents had been mailed to Plaintiff.

On December 8, 2015, Plaintiff sent a Revocation of Consent to Miriam's Promise, the Tennessee Department of Children's Services, Mr. Goldman, Ms. Rivette, the Paetzkes, and the California Department of Children and Family Services.

On December 9, 2015, Ms. Rivette called Plaintiff and told her the child would be returned that day. Before it returned the child, Miriam's Promise required Plaintiff to sign an agreement releasing the Paetzkes, Adoption Planners, Miriam's Promise, AdoptHelp, Inc., AdoptHelp Law Center, and AdoptHelp's employees and officers from liability.

Plaintiff signed the release, and the child was returned to her. The child has been in Plaintiff's custody ever since.

## II. PRE-SUIT NOTICE AND COMPLAINT

Some eleven months later, on or about November 15, 2016, Plaintiff sent two pre-suit notices to Miriam's Promise and two pre-suit notices to Cookeville Regional. Included with each notice were a draft complaint and a form authorizing Miriam's Promise, Cookeville Regional, and any person from Miriam's Promise or Cookeville Regional, to use and disclose Plaintiff's protected health information to investigate Plaintiff's claims.

On March 14, 2017, Plaintiff commenced this action by filing a complaint against AdoptHelp, Adoption Planners, Mr. Goldman, Mr. Wang, Ms. Rivette, Miriam's Promise, Ms. Balthrop, Ms. Groth, Cookeville Regional, Ms. Reid, and the Paetzkes (collectively, "Defendants"). The Complaint asserted claims for conversion and conspiracy to commit fraud and civil kidnapping against all defendants; claims for negligence against Miriam's Promise, Ms. Balthrop, Ms. Groth, Adoption Planners, and Ms. Rivette; and claims for professional negligence against Ms. Groth and Ms. Balthrop.

The Complaint alleged that the Paetzkes paid Mr. Goldman and Mr. Wang through Adoption Planners and AdoptHelp to abduct Plaintiff's child by using invalid documents, and that Adoption Planners and AdoptHelp provided the "illegal" documents to Ms. Rivette, who contracted with Miriam's Promise for the execution of the documents through Ms. Groth and Ms. Balthrop, who failed to advise Plaintiff about the illegal nature of the documents and induced her into signing them. The Complaint asserted the documents were void under Tennessee law because they purported to terminate Plaintiff's parental rights and waive Plaintiff's right of revocation when Tennessee's adoption statute requires termination of parental rights through adjudication in strict accordance with statutory procedures. The Complaint also asserts that Miriam's Promise, Ms. Groth, Ms. Balthrop, Adoption Planners, Mr. Goldman, and Ms. Rivette owed Plaintiff "a special duty of care," including the "duty to inform [Plaintiff] that the documents she executed were not valid in the State of Tennessee," because they represented themselves as having a "confidential relationship" with Plaintiff and possessed "greater knowledge of the legalities of her parental rights."

Along with the Complaint, Plaintiff filed a certificate of good faith and an affidavit of compliance purportedly in compliance with Tennessee Code Annotated §§ 29-26-121 and 122 of the Tennessee Health Care Liability Act ("THCLA").

On March 24 and 31, 2017, Plaintiff filed a second certificate of good faith and a motion to adopt the second certificate. The second certificate included the disclosure, as required by § 122, that Plaintiff's attorney had one prior violation of that section.[3] Plaintiff also requested the court to grant an extension of time and accept the amended certificate.

### III.    MOTIONS TO DISMISS

On or about June 15, 2017, Defendants filed motions to dismiss under Tennessee Rule of Civil Procedure 12.02(6). All defendants asserted, in one fashion or another, that Plaintiff's Complaint should be dismissed because (1) the adoption documents were valid under Tennessee law and not fraudulent; (2) Tennessee does not recognize the torts of civil kidnapping and conversion of a child; (3) Plaintiff filed her Complaint after the expiration of the applicable statutes of limitations; and (4) Plaintiff released Defendants from liability by signing the December 9, 2015 release agreement. Additionally, the defendants who asserted that the THCLA applied contended that Plaintiff's first certificate of good faith was non-compliant because it did not disclose the prior violation of § 122. Cookeville Regional also asserted that the Tennessee Governmental Tort Liability Act ("GTLA") barred Plaintiff's intentional tort claims.

After hearing arguments on Plaintiff's Motion to Adopt and Defendants' motions to dismiss, the court entered an order denying Plaintiff's Motion to Adopt and granting all of Defendants' motions to dismiss. In pertinent part, the trial court ruled that Tennessee law permits parents to surrender their parental rights under the rules of another state:

> 9)    In terms of Tennessee surrender, it appears that the procedures employed here are contemplated under the [Interstate Compact for the Placement of Children] and that Tennessee law allows for the election to be governed by the laws of another state with regard to this process of relinquishing rights, as well as to the process of adoption.
>
> 10)    As a predicate of all the claims against all the Defendants, the Plaintiff has asserted that, in this adoption, this process of surrender or "consent" (as it is termed under California law) was illegal under

---

[3] Tennessee Code Annotated § 29-26-122(d)(4) provides, "A certificate of good faith shall disclose the number of prior violations of this section by the executing party."

Tennessee law. The Court finds that that is not the case. The Court finds that Plaintiff's Complaint is incorrect and that this is a basis for dismissal of [Plaintiff's] entire suit, including all claims therein.

The court also made findings on the other grounds for dismissing the various claims, including (1) Tennessee does not recognize claims for "conversion of a child" or "tortious civil kidnapping"; (2) Plaintiff failed to plead her fraud claims with specificity; (3) Plaintiff's first certificate of good faith failed to comply with § 122 of the THCLA; (4) the GTLA and the statute of limitations barred Plaintiff's intentional tort claims against Cookeville Regional; and (5) the statute of limitations barred Plaintiff's claims against the remaining defendants. The court also found that Plaintiff's claims did not qualify for a 120-day extension of the statute of limitations under the THCLA because (a) she failed to provide Ms. Reid, Ms. Balthrop, and Ms. Groth with pre-suit notice under § 121, and (b) AdoptHelp, Adoption Planners, Mr. Goldman, Mr. Wang, Ms. Rivette, and the Paetzkes (collectively, "the AdoptHelp Defendants") were not "health care providers." Accordingly, the trial court dismissed the Complaint with prejudice. This appeal followed.

Plaintiff raises five issues on appeal that we restate as follows: (1) whether the trial court erred by finding that Plaintiff's surrender of her parental rights was valid under Tennessee law; (2) whether the trial court erred by finding that Plaintiff's claims were barred by the applicable statutes of limitations; (3) whether the trial court erred by failing to recognize claims for civil kidnapping and conversion of a child; (4) whether the trial court erred by finding that Plaintiff failed to state a claim for fraud and conspiracy; and (5) whether the trial court erred by dismissing the Complaint based on its finding that Plaintiff's certificate of good faith was deficient.[4]

## STANDARD OF REVIEW

A Tenn. R. Civ. P. 12.02(6) motion to dismiss challenges only the legal sufficiency of the complaint, not the strength of the plaintiff's proof or evidence. *Webb v. Nashville Area Habitat for Humanity, Inc.*, 346 S.W.3d 422, 426 (Tenn. 2011) (citations omitted). The resolution of a Rule 12.02(6) motion to dismiss is determined by an examination of the pleadings alone. *Id.* A defendant who files a motion to dismiss "admits the truth of all of the relevant and material allegations contained in the complaint, but . . . asserts that the allegations fail to establish a cause of action." *Webb*,

---

[4] Plaintiff did not appeal the trial court's determination that the GTLA bars her intentional tort claims against Cookeville Regional.

346 S.W.3d at 426. (quoting *Brown v. Tenn. Title Loans, Inc.*, 328 S.W.3d 850, 854 (Tenn. 2010)).

When considering a motion to dismiss, courts "must construe the complaint liberally, presuming all factual allegations to be true and giving the plaintiff the benefit of all reasonable inferences." *Webb*, 346 S.W.3d at 426 (quoting *Tigg v. Pirelli Tire Corp.*, 232 S.W.3d 28, 31–32 (Tenn. 2007)). A trial court should grant a motion to dismiss "only when it appears that the plaintiff can prove no set of facts in support of the claim that would entitle the plaintiff to relief." *Webb*, 346 S.W.3d at 426 (quoting *Crews v. Buckman Labs. Int'l, Inc.*, 78 S.W.3d 852, 857 (Tenn. 2002)). We review the trial court's legal conclusions regarding the adequacy of the complaint de novo. *Webb*, 346 S.W.3d at 427 (citing *Brown*, 328 S.W.3d at 855; *Stein v. Davidson Hotel Co.*, 945 S.W.2d 714, 716 (Tenn. 1997)).

## ANALYSIS

We find the dispositive issues to be (1) whether Tennessee recognizes a claim for conversion of a child, tortious civil kidnapping, or a stand-alone claim of conspiracy to commit fraud, and (2) whether the actionable claims are time barred. We will address each issue in turn.

### I. CONVERSION, KIDNAPPING & CONSPIRACY TO COMMIT FRAUD

### A. Conversion of a Child

The Complaint alleges that Defendants "collectively engaged in a conspiracy to convert the person of the child to the adoptive parents, illegally and for profit."[5] Plaintiff argues that her child became "property" when Defendants made the child the subject of a

---

[5] The elements of a conversion claim include: "(1) an appropriation of another's tangible property to one's use and benefit; (2) an intentional exercise of dominion over the chattel alleged to have been converted; and (3) defiance of the true owner's rights to the chattel." *White v. Empire Exp., Inc.*, 395 S.W.3d 696, 720 (Tenn. Ct. App. 2012) (citing *River Park Hosp., Inc. v. BlueCross BlueShield of Tenn., Inc.*, 173 S.W.3d 43, 60 (Tenn. Ct. App. 2002). "A wrongful intent on the part of the defendant is not an element of conversion and, therefore, need not be proved." *Id.* (citation omitted). A conversion claim focuses on "the interference with a property owner's right." *Id.* (quoting *Gen. Elec. Credit Corp. of Tenn. v. Kelly & Dearing Aviation*, 765 S.W.2d 750, 754 (Tenn. Ct. App. 1988)). Normally, the appropriate measure of damages for the conversion of property is "the value of the property converted at the time and place of conversion, with interest." *Scott v. Houston*, No. E2009-01118-COA-R3-CV, 2010 WL 680984, at *7 (Tenn. Ct. App. Feb. 26, 2010) (quoting *Lance Prods., Inc. v. Commerce Union Bank*, 764 S.W.2d 207, 213 (Tenn. Ct. App. 1988)).

commercial transaction. She cites Tennessee Code Annotated § 36-2-303 for the proposition that a mother is the natural custodian of a child born out of wedlock, and § 34-1-102(a) for the proposition that parents are the natural guardians of children during minority, and argues that she had a constitutional right to the care and custody of her child. Thus, Plaintiff asserts that Defendants' intentional exercise of control over her child for Defendants' own benefit, and in defiance of Plaintiff's constitutional rights, constituted conversion of her property. Defendants counter that the tort of conversion applies only to the appropriation of tangible, personal property or chattel. They argue that a parent or guardian's custody of a child does not vest the child with the legal status of chattel or property.

Analogizing adoption to the sale of goods is not novel in academic settings. *See* Richard A. Posner, *The Regulation of the Mkt. in Adoptions*, 67 B.U.L. Rev. 59, 64 (1987) (analogizing the "sale of babies to the sale of an ordinary good"). But Tennessee law is irreconcilable with a notion that children are the "property" of their parents. We have described the concept of property as a bundle of rights or legally protected interests, including "(1) the right of possession, enjoyment and use; (2) the unrestricted right of disposition; and (3) the power of testimonial disposition." *State ex rel. Elvis Presley Int'l Mem'l Found. v. Crowell*, 733 S.W.2d 89, 96 (Tenn. Ct. App. 1987) (citations omitted). Although parents have a constitutional right to the care and custody of their children, *In re Audrey S.*, 182 S.W.3d 838, 860 (Tenn. Ct. App. 2005) (citations omitted), they do not have a right to the disposition of their children.

In *Davis v. Davis*, the Tennessee Supreme Court considered whether to categorize preembryos as "persons" or "property" under Tennessee law. 842 S.W.2d 588, 594 (Tenn. 1992). The Court recognized that defining preembryos as "persons" would vest them "with legally cognizable interests separate from those of their [parents]," but defining preembryos as "property" would give those with decision-making authority unlimited discretion in the actions taken with preembryos. *Id.* at 595–96 (citing *Rep. of the Ethics Comm.*, 53 J. Am. Fertility Soc'y 34S (June 1990)). The Court ultimately found that the parties did not have a "true property interest" in the preembryos but did "have an interest in the nature of ownership, to the extent that they have decision-making authority concerning disposition of the preembryos." *Davis*, 842 S.W.2d at 597. Based on this finding, the Court recognized that a private agreement about the disposition of the preembryos would bind the parties. *Id.* The Court also noted that, if preembryos were given the legal status of persons, an agreement on their disposition "would be unenforceable in the event of a later disagreement, because the trial court would have to make an ad hoc 'best interest of the child' determination in every case." *Id.*

Inherent in the Court's reasoning in *Davis* is the principle that parties cannot contract for the disposition of a child. *See also Welch v. Welch*, 195 S.W.3d 72, 76 (Tenn. Ct. App. 2005) (stating that a parent's "duty to support arises out of the parent-child

relationship and, unlike a property right, 'cannot be "bargained away" by contract'" (quoting *C.J.H. v. A.K.G.,* No. M2001-01234-COA-R3-JV, 2002 WL 1827660, at *4 (Tenn. Ct. App. Aug. 9, 2002))). Similarly, a parent's constitutional right to care for his or her child is not a "property right" subject to conversion by another.

For the foregoing reasons, we hold that conversion of a child is not a recognized cause of action; therefore, Plaintiff cannot maintain a cause of action for conversion of a child.

## B. Tortious Civil Kidnapping

As for the claim of tortious civil kidnapping, Tennessee does not recognize this as a civil cause of action. *See Monroe v. McNairy County*, 850 F. Supp. 2d 848, 876 (W.D. Tenn. 2012). Therefore, Plaintiff cannot maintain a cause of action for tortious civil kidnapping of a child.

## C. Conspiracy to Commit Fraud

As for the claims of conspiracy to commit fraud, Tennessee does not recognize this as a stand-alone claim. *See Pusser v. Gordon*, 684 S.W.2d 639, 642 (Tenn. Ct. App. 1984). As the court explained:

> A mere conspiracy to commit a fraud is never of itself a cause of action; it must be proved that there was a conspiracy to defraud and a participation in the fraudulent purpose, either in the scheme or in its execution, which worked injury as a proximate consequence. It is the civil wrong resulting in damage and not the conspiracy which constitutes the cause of action for conspiracy to defraud.

*Id*. (quoting 15A C.J.S. *Conspiracy*, § 9).

Moreover, Plaintiff failed to specifically plead the underlying fraud claim as Tenn. R. Civ. P. 9 requires. "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Tenn. R. Civ. P. 9.02. Therefore, the trial court acted appropriately by dismissing the claim of conspiracy to commit fraud.

## II. STATUTES OF LIMITATIONS

It is undisputed that the claims at issue accrued, at the latest, on December 9, 2015, when the child was returned to Plaintiff and Plaintiff signed the agreement releasing Defendants from liability and that this action was commenced more than one

year later when Plaintiff filed her Complaint. Thus, the question is which statute of limitations applies to the various claims asserted against the defendants.

"[I]n choosing the applicable statute of limitations, courts must ascertain the gravamen of each claim, not the gravamen of the complaint in its entirety." *Benz-Elliott v. Barrett Enterprises, LP*, 456 S.W.3d 140, 149 (Tenn. 2015). Likewise, "application of the THCLA . . . should be considered with respect to each separate claim rather than with respect to the complaint as a whole." *Lacy v. Mitchell*, 541 S.W.3d 55, 62 (Tenn. Ct. App. 2016). "[G]ravamen is not dependent upon the 'designation' or 'form' litigants ascribe to an action." *Benz-Elliott*, 456 S.W.3d at 148 (quoting *Redwing v. Catholic Bishop for Diocese of Memphis*, 363 S.W.3d 436, 457 (Tenn. 2012)). To ascertain the gravamen of a claim, "a court must first consider the legal basis of the claim and then consider the type of injuries for which damages are sought." *Benz-Elliott*, 456 S.W.3d at 151.

Tort claims for "injuries to the person" are subject to a one-year statute of limitations. Tenn. Code Ann. § 28-3-104(a)(1)(A). Tort claims for injuries to property or conversion of personal property are subject to a three-year statute of limitations. *Id.* §§ 105(1)–(2). Health care liability actions are subject to a one-year statute of limitations, *id.* § 29-26-116(a)(1), but the limitations period is extended by 120 days if the plaintiff provides the defendants with pre-suit notice of her claim in compliance with Tennessee Code Annotated section 29–26–121(a) before the statute of limitations expires. *Woodruff by & through Cockrell v. Walker*, 542 S.W.3d 486, 494 (Tenn. Ct. App. 2017) (citing Tenn. Code Ann. § 29-26-121(c)).

As for Plaintiff's claims against the AdoptHelp Defendants,[6] Plaintiff contends these claims are subject to a three-year statute of limitation because her injury arose from the conversion of her property and conspiracy to commit fraud. Because we have determined that conversion of property is not applicable, and conspiracy to commit fraud is not actionable in Tennessee, we affirm the dismissal of these claims without further discussion.

---

[6] Although Plaintiff additionally asserts that the trial court erred by failing to apply the 120-day extension to the AdoptHelp Defendants, she concedes that the AdoptHelp Defendants are not health care providers and does not develop an argument on this issue "[W]here a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived." *Sneed v. Bd. of Prof'l Responsibility of Supreme Court*, 301 S.W.3d 603, 615 (Tenn. 2010).

As for Plaintiff's claims against Miriam's Promise, Ms. Groth, Ms. Balthrop, Cookeville Regional, and Ms. Reid, she contends these are health care liability actions that qualify for the 120-day extension under § 121(c). We begin with the THCLA claims.

## A. Tennessee Health Care Liability Act

"A claim will be subject to the THCLA if the facts of the case show that it qualifies as a 'health care liability action' as that term is statutorily defined." *Osunde v. Delta Med. Ctr.*, 505 S.W.3d 875, 884 (Tenn. Ct. App. 2016). The THCLA defines a "health care liability action" as "any civil action . . . alleging that a health care provider or providers have caused an injury related to the provision of, or failure to provide, health care services to a person, regardless of the theory of liability on which the action is based." Tenn. Code Ann. § 29-26-101(a). We have interpreted this definition as composing three requirements: "(1) it is a civil action; (2) the claim is against a health care provider; and (3) the harm complained of arises from 'the provision of, or failure to provide, health care services.'" *Igou v. Vanderbilt Univ.,* No. M2013-02837-COA-R3-CV, 2015 WL 1517794, at *4 (Tenn. Ct. App. Mar. 27, 2015) (footnotes omitted) (quoting Tenn. Code Ann. § 29-26-101(a)(1)).

As is relevant here, the THCLA defines "health care provider" as,

(A)     a health care practitioner licensed . . . under any chapter of title 63 or title 68 . . . ;

.   .   .

(E)     A professional corporation or professional limited liability company established pursuant to title 48, a registered limited liability partnership rendering professional services under title 61 and which consists of one (1) or more health care practitioners licensed, authorized, certified, registered, or regulated under any chapter of title 63 or title 68, or any legal entity that is not itself required to be licensed but which employs one or more health care practitioners licensed, authorized, certified, registered, or regulated under any chapter of title 63 or title 68[.]

Tenn. Code Ann. § 29-26-101(a)(2). The THCLA defines "health care services" as care by health care providers, persons under the supervision of health care providers, and "includes staffing, custodial or basic care, positioning, hydration and similar patient services." *Id*. § 101(b).

To determine whether a defendant "caused an injury related to the provision, or failure to provide, health care services," we have looked at whether the alleged *conduct* that caused the injury involved the provision, or failure to provide, health care services.

- 12 -

*See C.D. v. Keystone Continuum, LLC*, No. E2016-02528-COA-R3-CV, 2018 WL 503536, at *5 (Tenn. Ct. App. Jan. 22, 2018). "Given the breadth of the statute, it should not be surprising if most claims now arising within a medical setting constitute health care liability actions." *Osunde*, 505 S.W.3d at 884–85. Nonetheless, "whether a health care liability action is implicated is entirely dependent on whether the factual allegations meet the definition outlined in the statute." *Id*. at 885 n.6.

The Complaint alleges that Ms. Balthrop, Ms. Groth, and Ms. Reid are social workers licensed and regulated under title 63 of the Tennessee Code and that Miriam's Promise and Cookeville Regional engage "in providing services by licensed social workers." As licensed social workers, Ms. Groth, Ms. Balthrop, and Ms. Reid qualify as health care providers as defined in Tennessee Code Annotated § 29-26-101(a)(2)(A). *See Ellithorpe v. Weismark*, 479 S.W.3d 818, 827 (Tenn. 2015) (finding defendant-social worker was a health care provider because she was licensed under title 63 of the Tennessee Code). Giving Plaintiff the benefit of all reasonable inferences, Miriam's Promise and Cookeville Regional qualify as health care providers under the definitions contained in § 101(a)(2)(E). Thus, the only question remaining is whether the alleged conduct of these defendants equates to an allegation of injury caused by the provision of health care services or lack thereof.

Because the factual allegations against Miriam's Promise, Ms. Groth, and Ms. Balthrop ("the Miriam's Promise Defendants") do not completely overlap with the factual allegations against Cookeville Regional and Ms. Reid, we will consider separately whether the THCLA and its 120-day extension apply to each group of defendants. *See Lacy*, 541 S.W.3d at 60 (concluding that a complaint asserted two claims because it alleged injuries caused by two separate, wrongful acts, and examining each claim separately).

1.    THCLA Claims against Cookeville Regional and Ms. Reid

The Complaint alleges that Ms. Reid owed Plaintiff a special duty of care because she held herself out as a social worker for Plaintiff; that Ms. Reid presented Plaintiff with forms published by Cookeville Regional related to the care and release of the child while Plaintiff was under the influence of medication; that Ms. Reid misrepresented that Plaintiff could change her mind regarding her choices; that Ms. Reid failed to give Plaintiff a copy of the forms that Plaintiff signed; and that Ms. Reid participated in a conspiracy to induce Plaintiff into executing "illegal" documents to kidnap Plaintiff's

child. Plaintiff concludes that Ms. Reid's actions constituted negligence. Plaintiff also alleges that Cookeville Regional is vicariously liable for Ms. Reid's acts.[7]

Tennessee Code Annotated § 29-26-101(b) defines a health care liability action as including care by "agents, employees and representatives of the provider, and also includes staffing, custodial or basic care, positioning, hydration and similar patient services." Therefore, the allegations in the Complaint relate to the provision of health care services because the forms that Ms. Reid presented to Plaintiff were related to the child's care and release from the hospital. *See Mullin v. Rolling Hills Hosp.*, No. 3:16-CV-02609, 2017 WL 6523482, at *5 (M.D. Tenn. Apr. 17, 2017) (holding that claims were governed by the THCLA because the alleged injuries arose from actions taken as part of plaintiff's treatment and the application or misapplication of the rules governing involuntary admission). Thus, Plaintiff's claims against Cookeville Regional and Ms. Reid were subject to the one-year statute of limitations under Tennessee Code Annotated § 29-26-116(a)(1).

Because Plaintiff filed her Complaint more than a year after her claims arose, the claim is barred unless Plaintiff complied with the pre-suit notice requirements of Tennessee Code Annotated § 29-26-121(a).

The requirements of Tennessee Code Annotated § 29-26-121(a) serve "related yet ultimately distinct goals":

> First, Tenn. Code Ann. § 29-26-121(a)(1) contains an express notice requirement that requires plaintiffs to give defendants written notice that a potential healthcare liability claim may be forthcoming. In contrast, Tenn. Code Ann. §§ 29-26-121(a)(2)(A)–(C) facilitate early resolution of healthcare liability claims by requiring plaintiffs to advise defendants who the plaintiff is, how to reach him or her, and how to contact his or her attorney. Lastly, the requirements of Tenn. Code Ann. § 29-26-121(a)(2)(D) and Tenn. Code Ann. § 29-26-121(a)(2)(E) serve an investigatory function, equipping defendants with the actual means to evaluate the substantive merits of a plaintiff's claim by enabling early discovery of potential co-defendants and early access to a plaintiff's medical records.

---

[7] As already stated, Plaintiff did not appeal the trial court's determination that the GTLA bars her intentional tort claims against Cookeville Regional; thus, her claims against Cookeville Regional are limited to vicarious liability for the alleged negligence of Ms. Reid.

*Stevens ex rel. Stevens v. Hickman Cmty. Health Care Servs., Inc.*, 418 S.W.3d 547, 554 (Tenn. 2013). Sections 121(a)(3) and (a)(4) contain requirements for "how pre-suit notice is to be delivered and service of notice proven." *Arden v. Kozawa*, 466 S.W.3d 758, 763 (Tenn. 2015).

The trial court found that Plaintiff did not comply with § 121(a) because she did not provide Ms. Reid "with pre-suit notice addressed to [Ms. Reid]." Plaintiff contends that she substantially complied with § 121(a)(3)'s requirements because she sent two pre-suit notices to the address of Ms. Reid's employer, Cookeville Regional, and Ms. Reid had notice of the claims.

Section 121(a)(1) requires a plaintiff to "give written notice of the potential claim to each health care provider that will be named defendant at least sixty (60) days before the filing of a complaint based upon health care liability in any court of this state." Tenn. Code Ann. § 29-26-121(a)(1). Section 121(a)(3)(B) provides that the plaintiff may satisfy this requirement by showing that written notice was mailed "[t]o the individual health care provider at both the address listed for the provider on the Tennessee department of health web site and the provider's current business address, if different." *Id*. §§ 121(a)(3), (3)(B). Strict compliance with § 121(a)(1) is required. *Runions v. Jackson-Madison Cty. Gen. Hosp. Dist.*, 549 S.W.3d 77, 86 (Tenn. 2018) (citations omitted). Substantial compliance, however, is permitted for § 121(a)(3)(B). *Arden*, 466 S.W.3d at 764.

What is important is that § 121(a)(1) requires a plaintiff to *direct* the pre-suit notice to each potential defendant while § 121(a)(3) permits *delivery* of the notice in a manner not specified by the statute, so long as the defendant is not prejudiced by the deviation. *Compare Runions*, 549 S.W.3d at 87 (holding plaintiff did not comply with § 121(a) when he sent pre-suit notice to the correct address but did not direct notice to defendant) *with Hinkle v. Kindred Hosp.*, No. M2010-02499-COA-R3CV, 2012 WL 3799215, at *7–8 (Tenn. Ct. App. Aug. 31, 2012) (holding plaintiff complied with § 121(a) when he directed notice to defendant but addressed notice to defendant's Chief Administrator rather than its agent for service of process). That a potential defendant received indirect notice is irrelevant under § 121(a)(1). "[T]he proper inquiry is whether the plaintiff *gave* pre-suit notice to the health care provider to be named a defendant, not whether the health care provider knew about the claim based on pre-suit notice of the claim directed to another potential defendant." *Runions*, 549 S.W.3d at 87. Thus, a plaintiff must "communicate in writing *directed* to the potential defendant about the claim." *Id*. (emphasis added).

Here, Plaintiff did not direct written notice to Ms. Reid. Accordingly, we affirm the trial court's determination that Plaintiff failed to comply with the requirements of § 121(a).

Because Plaintiff did not strictly comply with § 121(a), her health care liability claims against Ms. Reid were barred by the applicable statute of limitations, Tennessee Code Annotated § 29-26-116(a)(1). Therefore, we affirm the dismissal of the claims against Ms. Reid.

Although Plaintiff directed written notice to Cookeville Regional, a plaintiff's right to pursue a vicarious liability claim against a principal is precluded "when the plaintiff's claim against the agent is procedurally barred by operation of law before the plaintiff asserts a vicarious liability claim against the principal." *Abshure v. Methodist Healthcare-Memphis Hosps.*, 325 S.W.3d 98, 106 (Tenn. 2010). Because Plaintiff filed her complaint against Cookeville Regional after her claims against Ms. Reid were barred, her claims of vicarious liability against Cookeville Regional are also barred. Therefore, we affirm the dismissal of the claims against Cookeville Regional.

### 2. Purported THCLA Claims against the Miriam's Promise Defendants

The allegations as to the Miriam Promise Defendants are substantively different from those against Ms. Reid and Cookeville Regional discussed immediately above. The Complaint alleges that the Miriam's Promise Defendants induced Plaintiff "to engage in an illegal child trafficking scheme for profit to the detriment of the [Plaintiff]," and "knew or should have known that the documents they were asking [Plaintiff] to execute were illegal." The Complaint also alleges that Ms. Balthrop and Ms. Groth breached their "duty to disclose to [Plaintiff] the illegality of the documents which [they] required [Plaintiff] to execute" and prevented Plaintiff "from seeking competent counsel." Like her allegations against the other defendants, Plaintiff alleges that the Miriam's Promise Defendants engaged in a conspiracy to perpetrate "a fraud and illegal act against [P]laintiff by inducing her into executing documents upon which they knew or should have known were illegal in the State of Tennessee for the profiteering of child trafficking and civil child kidnapping." We find these allegations fail to allege an injury related to the provision of health care services.

Although some licensed clinical social workers are qualified to provide mental health services, the practice of a licensed social worker may also involve non-health-related services. *See* Tenn. Code Ann. § 63-23-105(a) (stating that the practice of a licensed clinical social worker may include counseling, psychotherapy, providing information and referrals, and "the development, implementation, and administration of policies, programs and activities"). Indeed, title 63 of the Tennessee Code expressly *prohibits* some types of licensed social workers from providing counseling services. *See id.* § 102(a) (stating that a licensed baccalaureate social worker is "not qualified to diagnose or treat mental illness nor provide psychotherapy services"). Further, Tennessee's adoption statute identifies adoption placement services as a special type of social work that requires an additional license. *See id.* § 36-1-102(32) (defining "licensed

clinical social worker" as an individual holding a license under title 63, chapter 23 of the Tennessee Code and a license from the Department of Children's Services to provide adoption placement services).

In *Ellithorpe v. Weismark*, the Tennessee Supreme Court held that the plaintiffs' negligence claims fell under the THCLA when the complaint alleged the plaintiffs suffered emotional distress after a licensed, clinical social worker provided counseling to their child without the plaintiffs' consent or involvement. 479 S.W.3d at 820–22. The Court reasoned that the complaint alleged an injury related to the provision of health care services because it alleged specifically that the defendant was "negligent in providing health services." *Id*. at 828 (emphasis omitted).

Unlike the complaint in *Ellithorpe*, which alleged the defendant-social worker offered and provided counseling, Plaintiff's Complaint expressly alleges that Miriam's Promise did *not* provide or offer counseling. In addition, the Complaint does not allege that Plaintiff engaged the Miriam's Promise Defendants to provide counseling or that the Miriam's Promise Defendants otherwise assumed a duty to provide counseling. The allegations against the Miriam's Promise Defendants pertain solely to the provision or failure to provide information about Plaintiff's legal rights during the adoption placement process. *See Horak v. Biris*, 474 N.E.2d 13, 19 (Ill. App. Ct. 1985) (distinguishing social-worker malpractice actions based on psychological counseling from social-worker malpractice actions based on community organization, research, or welfare administration); *Engstrom v. State*, 461 N.W.2d 309, 317 n.3 (Iowa 1990) (distinguishing a social worker's function in adoption proceedings from a social worker's function in providing counseling or therapy, because, in the latter, "there is a clear therapist-patient relationship analogous to a physician-patient relationship"); *cf Goebel v. Arnett*, 259 S.W.3d 489, 494 (Ky. Ct. App. 2007) (reversing summary dismissal of biological mother's claims for intentional infliction of emotional distress based on adoption agency's alleged coercion).

That the adoption would not have been initiated but-for Plaintiff giving birth is too tenuous a connection to categorize the alleged injury caused by the Miriam's Promise Defendants as "related to" health care services. *See Lacy v. Vanderbilt Univ. Med. Ctr.*, No. M2016-02014-COA-R3-CV, 2017 WL 6273316, at *6 (Tenn. Ct. App. May 4, 2017), (conjecturing that allegations of "an injury caused by a doctor running over a person in a hospital parking lot as he or she leaves work" could be described as literally "related to" the provision of health care services but such an interpretation of the THCLA "would be absurd"). Similarly, that Plaintiff alleges the Miriam's Promise Defendants engaged in a conspiracy with Cookeville Regional and Ms. Reid does not "relate" the injury to the provision of health care services. The alleged actions of the Miriam's Promise Defendants took place before and after Plaintiff's hospital stay, and the documents Plaintiff signed were unrelated to the care she received.

Based on the foregoing, we find Plaintiff's claims against the Miriam's Promise Defendants sound in ordinary negligence rather than health care liability. Consequently, the 120-day extension under Tennessee Code Annotated § 29-26-121(c) does not apply to the claims against the Miriam's Promise Defendants.

## B. The Remaining Claims

In addition to the THCLA claims addressed above, Plaintiff asserted a plethora of claims, all of which sound in tort for personal injury. Because the remaining claims sound in tort for personal injuries, they are subject to the one-year statute of limitations in Tennessee Code Annotated § 28-3-104(a)(1). It is undisputed that Plaintiff filed her Complaint more than a year after her claims accrued. Therefore, these claims are time-barred as the trial court correctly ruled.

Having found that Plaintiff's claims were time-barred, we decline to address the remaining issues raised.

## IN CONCLUSION

The judgment of the trial court is affirmed, and this matter is remanded with costs of appeal assessed against McKayla Taylor.

_____
FRANK G. CLEMENT JR., P.J., M.S.

- 18 -