# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs May 1, 2020

## MICHAEL BENNETT ET AL. v. CHATTANOOGA PROPERTIES, LLC

**Appeal from the Circuit Court for Hamilton County**
**No. 16C827  W. Jeffrey Hollingsworth, Judge**

_____

### No. E2019-01790-COA-R3-CV

_____

Buyers filed this breach of contract action alleging that the seller failed to timely complete construction of their custom home. Buyers also sought damages for conversion based on the seller's failure to return fixtures and other items purchased by the buyers for use in the construction. The seller maintained that construction was complete, as that term was defined in the parties' agreement. In its counterclaim for breach of contract, the seller alleged that the buyers committed the first material breach by refusing to finalize the purchase. After a bench trial, the trial court found that the buyers had committed the first material breach by refusing to close the purchase after the seller had completed performance. The court dismissed the buyers' claims and awarded the seller damages and attorney's fees. The evidence does not preponderate against the trial court's findings with respect to the parties' breach of contract claims. But we conclude that the court erred in dismissing the buyers' conversion claim. All the elements of a conversion claim were established at trial. So we reverse the dismissal of the conversion claim and remand for a determination of damages on that claim. Otherwise, we affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part and Reversed in Part; Case Remanded

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and THOMAS R. FRIERSON II, J., joined.

Tracy C. Wooden and Warren J. Yemm, Chattanooga, Tennessee, for the appellants, Michael Bennett and Debbie Bennett.

C. Chad Young and Christopher M. Harris, Ringgold, Georgia, for the appellee, Chattanooga Properties, LLC.

# OPINION

## I.

### A.

Michael and Debbie Bennett wanted a custom-built home in the Chattanooga area. They selected Chattanooga Properties, LLC, a company with twenty years of experience in residential construction, as their builder. On November 23, 2015, the parties executed a New Construction Purchase and Sale Agreement, which governed their respective rights and obligations. The Bennetts paid a $10,000 deposit. The remainder of the purchase price was due at closing. As allowed in the contract, the Bennetts also purchased various fixtures and decorative items for Chattanooga Properties to install.

The sale was originally scheduled to close on May 20, 2016. But weather-related delays forced the parties to extend the closing date to June 14, 2016. To compensate the Bennetts for further delay, the parties agreed that

> If house is not complete and closing does not occur on or before June 14, 2016, seller agrees to pay buyer $61.66 per day beginning on 6/15/16 to cover rent increase and storage fees that Buyers will incur until such date that this transaction is closed.

> If contract is not closed by 6/14/16, seller agrees to pay [a specified amount] to extend the locked interest rate on Buyers loan [for up to 30 days].

These agreements were reflected in two written contract amendments, signed by the parties.

By the end of May, construction was "down to the nitty-gritty." Chattanooga Properties brought in Jason Moore to supervise the end of construction. The builder also permitted the Bennetts, who had been living in a travel trailer at an area campground during construction, to relocate their trailer adjacent to the construction site. Their new vantage point afforded the Bennetts closer oversight of the project. And they frequently directed Mr. Moore's attention to issues they wanted addressed. Mr. Moore, as he later explained, would "make those problems disappear, normally within a day."

Despite Mr. Moore's efforts, Chattanooga Properties failed to meet the June 14 closing deadline. Brent Mercer, the owner of Chattanooga Properties, blamed the additional delay on problems with installing some of the custom fixtures selected by the Bennetts. Still, the company obtained a certificate of occupancy for the home on June 15.

2

That same day, an appraiser for the Bennetts' lender inspected the property. He found that construction was nearly complete, with only a few minor items remaining. The appraiser conditioned lender approval on "final cleanup and installation of fixtures and a sink on the main level." He estimated the cost to complete these final steps as "less than a thousand."

Mr. Mercer estimated that construction would be substantially complete by June 23. So on June 17, he invited the Bennetts to move into the home. The Bennetts declined, choosing instead to return to the campground.[1] According to Mr. Mercer, the Bennetts verbally agreed to extend the closing date to June 23. But they never signed the written contract amendment he provided.

When the appraiser returned on June 22, he noted that the site "appear[ed] to be cleaned up," and the sink and other fixtures had been installed. He certified the home as complete. "Complete," for his purposes, meant that the home was marketable and a viable asset to the lender. On June 23, the lender told the Bennetts that they were clear to close.

The Bennetts arranged for a home inspection on June 24. They also conducted their own inspection with their realtor, Jeff Nowland. Mr. Nowland helped the Bennetts to create a punch list of items they deemed incomplete or defective. And he forwarded the punch list to Chattanooga Properties. Mr. Nowland viewed the punch list items as "very minor." This sentiment was echoed by the home inspector, who testified that he observed "a lot of little, small things" that were easily fixed.

Concerned that the contract had expired on June 14, Mr. Nowland asked the Bennetts to sign two additional contract amendments. One amendment extended the contract through a new closing date of July 5, 2016. The second required Chattanooga Properties "to reimburse Buyers for additional living expense of $500 dollars for the period of June 15, 2016-July 2, 2016 due to non-closing of house by contracted date of June 14, 2016." Believing that these amendments were unnecessary and possibly detrimental, the Bennetts refused to sign them.

Later that afternoon, Mr. Nowland sent Mr. Bennett a list of available closing times on June 30, July 1, and July 5. Mr. Bennett did not respond. And when Mr. Nowland contacted him again on June 27 about a possible closing, Mr. Bennett referred him to his attorney.

Through the Bennetts' attorney, Mr. Nowland discovered that his clients were willing to close on July 5 provided that construction was complete. Mr. Nowland assured the attorney that as of June 27, "all items on the list have been completed." But Mr. Bennett reported that several items still appeared to be unfinished. According to the attorney, the

---

[1] The developer of the subdivision objected to the trailer's presence in the subdivision.

Bennetts wanted to know "when EVERYTHING regarding construction w[ould] be complete." They were only willing to close on July 5 "if all items can be completed and inspected to confirm completion well before" closing and the builder paid them for the delay as specified in the signed contract amendment. So Mr. Nowland asked Mr. Mercer for a completion timeline.

Mr. Mercer believed that the punch list items had been addressed. He assumed that the Bennetts just did not like the house. So he offered them a refund of their earnest money, plus an additional $10,000 to cover the items they had purchased for installation. The Bennetts declined the offer. In Mr. Mercer's view, the parties had reached an impasse. Chattanooga Properties relisted the property on June 30.

B.

The Bennetts filed suit against Chattanooga Properties seeking damages for breach of contract and conversion of personal property.[2] The complaint alleged that Chattanooga Properties failed to "complete construction of the home by the contracted time" and "refuse[d] to sell the property to Plaintiffs as agreed in the sales contract." Chattanooga Properties denied these allegations and counterclaimed for breach of contract. The counterclaim alleged that the Bennetts were the defaulting party.

Ultimately, the dispute went to trial. The court heard evidence from multiple witnesses over a three-day period. The parties presented conflicting evidence on several key points.

The Bennetts argued that they had no obligation to close on an incomplete house. It was undisputed that their obligation to finalize the purchase was contingent on the "completion" of construction. The contract specified that "construction shall be deemed to be completed at such time as [the Seller provides Buyer with copies of all applicable inspections and approvals] and Buyer has inspected and confirmed that the contract is substantially completed." "Substantial Completion," as set forth in the contract, meant "that all matters of substance except minor touch-up matters have been completed." But "[i]f the reasonable cost of completion of Punch List items exceeds $500.00, the job shall not be deemed to be substantially complete."

The June 24 punch list included twenty-one items the Bennetts deemed incomplete or defective. They conceded that not all punch list items were "matters of substance."[3] But they insisted that "the big items" had "to be fixed" before closing because they involved

---

[2] The Bennetts initially sought specific performance, but this claim was abandoned before trial.

[3] Some of the smaller matters on the punch list included removing the plastic covers from the smoke detectors, arranging decorative rocks around the gas logs in the fireplace, missing lightbulbs, and various paint and grout touch-ups.

4

"substantial money." Among the items the Bennetts considered to be "matters of substance" were scratches in the hardwood floors, cracks in the concrete pads under the HVAC units, a misplaced gasket in the master shower drain, two small dents in the garage doors, and inadequate drainage in the backyard. According to the Bennetts, these matters remained unfinished for months after they submitted their punch list.

As evidence of the cost to repair the punch list items, the Bennetts relied exclusively on the testimony of Andrew Sellers. Mr. Sellers, an expert in residential construction and cost estimation, viewed the property in December 2016 and in early 2018. According to Mr. Sellers, many of the issues he observed were minor. The two main problems that grabbed his attention at both visits were signs of inadequate water drainage in the backyard and air conditioner pads "that were cracking and giving way." He estimated the cost to complete all punch list items, as of his 2018 visit, to be $11,810. The most expensive item was the backyard drainage. In his opinion, it would cost $8,730 to ensure proper drainage.

For his part, Mr. Mercer maintained that his company had addressed the Bennetts' complaints, both large and small, within a few days of receiving the punch list. Mr. Moore got "the painters in there" and did some painting himself, ordered replacement window screens, "took care of the [missing] light bulbs," brought in plumbers, and repaired the hardwood floors. All necessary replacement items had been ordered, including new garage doors.

Mr. Mercer had a subcontractor replace the cracked concrete pad within days. He was not surprised at the report of subsequent cracking. He explained that concrete cracked easily.[4] One of his employees had recently damaged both pads with a lawnmower. He was planning to replace them. Replacement pads were inexpensive, only about $45 each.

And the drainage issue had been resolved in June 2016. Mr. Moore arranged for the backyard to be re-graded so that stormwater was directed to the back of the property, near the property line, where it could then flow off the property into a ravine. According to Mr. Mercer, this was "a pretty standard design option." To his knowledge, there had been no problems with standing water on the property since the June grading.

Mr. Mercer was qualified as an expert in residential construction. He opined that the cost to complete the items on the June punch list was less than $500. At most, it was "somewhere in th[e] range" of $250 or $260.

The trial court found that the Bennetts committed the first material breach "by refusing to close the loan." The court rejected the buyers' claim that "the house was not substantially complete as that term [wa]s defined in the sales contract." The June 24 inspections revealed only minor issues, which were promptly addressed by the builder.

---

[4] In the words of the home inspector, "[c]oncrete cracks. It's just what it does."

The only evidence that the cost to complete the punch list items exceeded $500 was the testimony of Mr. Sellers. Finding that "Mr. Sellers was not a credible witness," the court determined that "there [wa]s no credible proof" to support the Bennetts' position.

As a result, the trial court dismissed the Bennetts' claims with prejudice. And it awarded Chattanooga Properties damages for the breach of contract, including reasonable attorney's fees.

## II.

Because this was a bench trial, our review is de novo on the record with a presumption that the trial court's factual findings are correct, unless the evidence preponderates against those findings. Tenn. R. App. P. 13(d). Evidence preponderates against a finding of fact if the evidence "support[s] another finding of fact with greater convincing effect." *Rawlings v. John Hancock Mut. Life Ins. Co.*, 78 S.W.3d 291, 296 (Tenn. Ct. App. 2001). We give great deference to the trial court's credibility assessments. *See Watson v. Watson*, 309 S.W.3d 483, 490 (Tenn. Ct. App. 2009). We do not disturb "factual findings based on witness credibility unless clear and convincing evidence supports a different finding." *Coleman Mgmt., Inc. v. Meyer*, 304 S.W.3d 340, 348 (Tenn. Ct. App. 2009). We review the trial court's conclusions of law de novo with no presumption of correctness. *Kaplan v. Bugalla*, 188 S.W.3d 632, 635 (Tenn. 2006).

### A.

The Bennetts contend that the trial court erred in finding that they committed the first material breach. They insist that Chattanooga Properties breached the contract by failing to complete construction by July 14, 2016.[5] "Whether a party has fulfilled its obligations under a contract or is in breach of the contract is a question of fact." *Forrest Constr. Co. v. Laughlin*, 337 S.W.3d 211, 225 (Tenn. Ct. App. 2009). When neither contracting party has fully performed, the court must "determine which party is chargeable with the first uncured material breach." *McClain v. Kimbrough Constr. Co.*, 806 S.W.2d 194, 199 (Tenn. Ct. App. 1990). A party who has materially breached a contract is not entitled to damages stemming from the other party's later material breach of the same contract. *John P. Saad & Sons, Inc. v. Nashville Thermal Transfer Corp.*, 715 S.W.2d 41, 47 (Tenn. 1986).

As they did in the trial court, the Bennetts argue that their obligation to perform never arose because Chattanooga Properties failed to complete construction. A condition precedent "must be fulfilled before the duty to perform an existing contract arises." *Strickland v. City of Lawrenceburg*, 611 S.W.2d 832, 837 (Tenn. Ct. App. 1980). We agree

---

[5] The trial court found that a May 20 contract amendment "contemplate[d] a closing extension of up to 30 days" after June 14, 2016.

that "completion" was a condition precedent. The contract expressly conditioned the Bennetts' obligation to finalize the purchase on the "Completion of the Improvements as herein provided." The Bennetts contend that Chattanooga Properties never fully completed every item on the punch list. But the contract did not obligate Chattanooga Properties to complete "everything" related to construction before closing. Rather, the contract provided that closing would occur when construction was "substantially complete."

The parties agree that "substantial completion" means that "the reasonable cost of completion of Punch List items [does not] exceed[] $500.00." Chattanooga Properties maintains that construction was "substantially complete" by June 24 or shortly thereafter. According to Mr. Mercer, most of the punch list items were easily fixed and the cost to repair was "somewhere in th[e] range" of $250 or $260. At trial, the Bennetts relied exclusively on Mr. Sellers's testimony to establish the cost to repair exceeded $500. The court rejected that testimony, finding that Mr. Sellers was not a credible witness. Instead, the court credited the testimony from Mr. Mercer and others in finding that the cost to complete the punch list was minimal. We accord that finding great weight. *See Williams v. City of Burns*, 465 S.W.3d 96, 120 (Tenn. 2015); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007).

To avoid this credibility issue, the Bennetts contend on appeal that this record contains other credible evidence that the cost to repair just the concrete pads and the garage doors "was no less than $540." We disagree. The upgrade charge for the garage doors, which were a special order, is not a reasonable measure of the cost to repair. There is no evidence that the Bennetts would have to pay $450 to replace the garage doors. The garage doors were replaced for free under the manufacturer's warranty. And the cost to replace both concrete pads was only $90-100.

We are equally unpersuaded by the argument that the Bennetts could not close without waiving their contractual right to liquidated damages. According to the Bennetts, Chattanooga Properties conditioned its offers to close on their agreement to "cap" their liquidated damages at $500. The proffered amendment was intended to reimburse the Bennetts for "additional living expense[s]." And even after the Bennetts rejected the amendment, Chattanooga Properties continued to offer to close.

Finally, we reject the Bennetts' contention that a "confirming final inspection" was also a condition precedent to their obligation to close. While the contract afforded the Bennetts inspection rights, a "condition precedent[] . . . will not be upheld unless there is clear language to support [it]." *Koch v. Constr. Tech., Inc.*, 924 S.W.2d 68, 71 (Tenn. 1996). The existence of a condition precedent is "usually signaled by a conditional word or phrase." *Harlan v. Hardaway*, 796 S.W.2d 953, 958 (Tenn. Ct. App. 1990). Throughout this contract, the parties used terms such as "contingent," "conditioned," or "shall first occur" to signal a condition precedent. We find no similar language used in connection with the buyers' inspection rights. Even so, the contract placed the onus for scheduling a

7

confirming inspection on the buyers. They requested a completion timeline, not an inspection. And they refused to set a closing date, a necessary pre-requisite to scheduling the final inspection.

The evidence does not preponderate against the trial court's finding that the Bennetts committed the first material breach. So we affirm the dismissal of their breach of contract claim and the award of breach of contract damages to Chattanooga Properties.

B.

But we conclude that the trial court erred in dismissing the Bennetts' conversion claim. A successful conversion claim requires proof that the defendant appropriated the plaintiff's property for its own use and benefit by intentionally exercising dominion over the property in defiance of the plaintiff's rights. *Barger v. Webb*, 391 S.W.2d 664, 665 (Tenn. 1965); *White v. Empire Exp., Inc.*, 395 S.W.3d 696, 720 (Tenn. Ct. App. 2012). No proof of wrongful intent is required. *White*, 395 S.W.3d at 720. Rather, the focus of a conversion claim is on "the interference with [the plaintiff's] property right." *Gen. Elec. Credit Corp. of Tenn. v. Kelly & Dearing Aviation*, 765 S.W.2d 750, 753 (Tenn. Ct. App. 1988).

The record shows that the Bennetts spent over $8,000 on various items—such as faucets, fans, lights, mirrors, and a refrigerator—for their future home. With the Bennetts' permission, Chattanooga Properties installed their purchases in the home. Using the property of another with the owner's permission is not conversion. *See id.* But, at some point, Chattanooga Properties began using the Bennetts' personal property for its own purposes. And, in August 2017, it leased the property to a third party. This was "a clear departure from the implied use authorized" by the Bennetts. *Id.* Mr. Mercer admitted that his company was still in possession of the Bennetts' property in 2018, with the possible exception of a broken fan. "The tort of conversion is complete once the defendant has taken, detained, or disposed of a chattel for an unreasonable length of time." *Id.*

Chattanooga Properties argues that it made "every effort" to close on the home and that, before the lawsuit, it offered to compensate the Bennetts for their property. These arguments show only that Chattanooga Properties had no wrongful intent, which is irrelevant to a conversion claim. Chattanooga Properties also points out that the Bennetts never demanded that the items be returned. Again, "[p]roof of a demand and refusal is not essential to recovery if a conversion is otherwise shown." *See PNC Multifamily Capital Institutional Fund XXVI Ltd. P'ship v. Bluff City Cmty. Dev. Corp.*, 387 S.W.3d 525, 554 (Tenn. Ct. App. 2012) (quoting 90 C.J.S. *Trover and Conversion* § 88(2012)).

The record shows that Chattanooga Properties converted the items that the Bennetts bought for installation in the home. So we reverse the trial court's dismissal of the Bennetts' conversion claim and remand for a calculation of damages on that claim.

D.

Finally, the Bennetts argue that the trial court's award of attorney's fees to Chattanooga Properties was excessive. The contract specified that the prevailing party in a breach of contract action was entitled to recover a reasonable amount of attorney's fees. *See Cracker Barrel Old Country Store, Inc. v. Epperson*, 284 S.W.3d 303, 309 (Tenn. 2009) (recognizing that a party in a civil action may recover attorney's fees when specifically authorized in a contract). Chattanooga Properties requested an award of $43,258.79. After reviewing the proof, the trial court awarded $42,000.

A trial court enjoys "considerable discretion in determining a reasonable attorney's fee." *First Peoples Bank of Tenn. v. Hill*, 340 S.W.3d 398, 410 (Tenn. Ct. App. 2010). We will uphold the court's decision absent an abuse of discretion. *Wright ex rel. Wright v. Wright*, 337 S.W.3d 166, 176 (Tenn. 2011). "A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence." *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010).

In determining a reasonable fee, trial courts consider a number of factors, including those listed in Rule 1.5 of the Tennessee Rules of Professional Conduct. *See Lexon Ins. Co. v. Windhaven Shores, Inc.*, 601 S.W.3d 332, 342 (Tenn. Ct. App. 2019); Tenn. Sup. Ct. R. 8, RPC 1.5. But "ultimately the reasonableness of the fee must depend upon the particular circumstances of the individual case." *Wright ex rel. Wright*, 337 S.W.3d at 177 (quoting *White v. McBride*, 937 S.W.2d 796, 800 (Tenn. 1996)).

We find no abuse of discretion in the trial court's decision. The court considered the appropriate factors. And after reviewing the billing records, the court determined that some of the requested fees included time spent on administrative, rather than legal work, and some entries were duplicative. So the court reduced the award accordingly. The Bennetts argue that the court should have deducted more. But the trial court found the remaining fees, overall, were "reasonable and necessary" in light of "the circumstances of the case and the work necessitated by the [Bennetts'] excessive motions." The court's decision was not illogical or unreasonable under the circumstances. *See Lee Med., Inc.*, 312 S.W.3d at 524.

Both parties request an award of attorney's fees on appeal. Under the contract, only the party that prevailed on its breach of contract claim was entitled to an award of attorney's fees. So we grant the request of Chattanooga Properties.

9

**III.**

We affirm the dismissal of the Bennetts' breach of contract claim, as well as the award of damages and attorney's fees to Chattanooga Properties on its counterclaim. But we reverse the dismissal of the conversion claim. We remand for entry of a judgment in the Bennetts' favor on their conversion claim and calculation of damages. Chattanooga Properties is entitled to its reasonable attorney's fees incurred on appeal. On remand, the trial court should also determine the appropriate amount of attorney's fees.

_____

W. NEAL MCBRAYER, JUDGE